3 F.3d 54
 62 USLW 2118
 In re APPLICATION OF Silvia GIANOLI ALDUNATE, and Jose
Miguel Barriga Gianoli.
Maria Luisa De Castro FODEN, and Edward Foden, Appellants,
v.
Silvia GIANOLI ALDUNATE, and Jose Miguel Barriga Gianoli, Appellees.
 No. 1543, Docket 93-7215.
 United States Court of Appeals,
Second Circuit.
 Argued May 6, 1993.
Decided Aug. 20, 1993.
 
 Philip L. Graham, Jr., New York City (Henry Christensen III, Basil P. Zirinis III, Anthony C. Walsh, Sullivan & Cromwell, New York City, Steven R. Humphrey, Robinson & Cole, Hartford, CT, of counsel), for appellants.
 Kenneth A. Caruso, New York City (Andrew W. Regan, Shearman & Sterling, New York City, James F. Stapleton, Joy Beane, Day, Berry & Howard, Stamford, CT, of counsel), for appellees.
 Before: MESKILL, PIERCE and WALKER, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an expedited appeal from a final order of the United States District Court for the District of Connecticut, Cabranes, C.J., denying the motion of appellants Maria Luisa de Castro Foden and Edward Foden (the Fodens) to vacate the district court's order granting discovery against them pursuant to 28 U.S.C. Sec. 1782 and to quash discovery subpoenas issued pursuant to that order. Appellees Silvia Gianoli Aldunate and Jose Miguel Barriga Gianoli (the Appellees), provisional guardians of the property of Ciro Gianoli Martinez (Ciro) in a Chilean incompetency proceeding, applied ex parte to the district court for an order pursuant to 28 U.S.C. Sec. 1782 granting them discovery from the Fodens concerning Ciro's assets in the United States. Section 1782 provides, in pertinent part, that upon the application of an interested party, the district court of the district in which a person resides or is found may order him to give his testimony or to produce documents for use in a proceeding in a foreign or international tribunal.
 
 
 2
 The district court granted the Appellees' motion and issued subpoenas against the Fodens. The Fodens moved to vacate the district court's order and quash the subpoenas on the grounds that, inter alia, section 1782 requires a threshold showing that the discovery sought in the district court would be available under the laws of the foreign jurisdiction, and that the Appellees had failed to make such a showing. The district court denied the motion, and this appeal followed. For the reasons stated below, we affirm.
 
 BACKGROUND
 
 3
 Ciro Gianoli Martinez, an 86 year old businessman and successful investor, resides in Santiago, Chile. Ciro married Elena Aldunate Lynch in 1935 and had four children, two of whom are still alive. Appellee Silvia Gianoli Aldunate is one of the living daughters and appellee Jose Miguel Barriga Gianoli is the son of one of the deceased daughters. Ciro and his first wife have been separated for decades, but allegedly under Chilean law are unable to obtain a divorce. Thirteen years ago, Ciro participated in a marriage ceremony in Uruguay with Ana Eguiguren Rozas (Ana), age 69, whom he had known for approximately 31 years. Ciro and Ana have lived together since the ceremony. Appellant Maria Luisa de Castro Foden is Ana's daughter and lives with her husband, appellant Edward Foden, in Connecticut.
 
 
 4
 Ciro's mental health recently deteriorated, prompting all of Ciro's living descendants to commence an incompetency proceeding before the Third Civil Court of Santiago, Chile, on April 9, 1992. The Fodens and the Appellees give differing accounts of Ciro's relationship with his daughters and Ana and of when his mental health deteriorated. The Fodens claim that Ciro has been estranged from his daughters and grandchildren for years, and that it was Ciro's intention that Ana was to care for him if he became ill. They state that Ciro was in good mental and physical health up until the time of a February 1992 seizure. The Appellees state that Ciro's mental health was good and his contact with his daughters and grandchildren was "consistent and regular" up until about 1989. At that point, according to the affidavits of two medical assistants who attended to Ciro at home, Ana began to isolate Ciro from his family and friends. Ana is accused, for example, of denying Ciro use of the telephone or access to any visitors.
 
 
 5
 On May 22, 1992, the Third Civil Court provisionally declared Ciro incompetent. The court appointed the Appellees as Ciro's provisional general guardians. Raul Jose Alamos Letelier, Ciro's attorney and business colleague, was also appointed provisional guardian, but "for the sole purpose of assuming direct care of [Ciro], which task he shall carry out jointly with Ana Eguiguren Rozas." The court ordered that the provisional guardians conduct "[i]n due time, a certified inventory of the property of" Ciro. Ana appealed the orders of the civil court, and the Supreme Court of Chile affirmed.
 
 
 6
 On June 4, 1992, the provisional guardians filed an inventory of Ciro's assets located in Chile with the Third Civil Court. In the inventory, the Appellees stated that Ciro also "possesses considerable property abroad," that they "are not, at present, in a position to give specific details on his assets," but that they are "making investigations and taking other measures to specify the amount and location of the assets located abroad" and will file an expanded inventory.
 
 
 7
 On October 27, 1992, the Appellees applied ex parte to the United States District Court for the District of Connecticut for a discovery order pursuant to 28 U.S.C. Sec. 1782. In support of their application the Appellees submitted the affidavit of George E. Deren, a financial investigator hired by the Appellees' counsel. In the affidavit, Deren describes the background of the incompetency proceeding, and then describes Casabianca Investments S.A. (Casabianca), a holding company founded by Ciro in 1981 through which "considerable" assets were held outside of Chile. Deren states that his investigations revealed that the Fodens became involved with Casabianca in September 1989, when the bank statements of a Casabianca account at Swiss Bank New York began to be mailed in care of Maria Luisa Foden to the address of her Hartford, Connecticut law office. According to the affidavit, beginning in November 1989, millions of dollars passed through the account, and the account was finally closed in September 1990. That same month, Maria Luisa Foden directed that the remaining funds in Casabianca's Daily Dollar Account be wired to a client account of hers in Hartford. Deren states that on July 10, 1990, Edward Foden had become Vice President, Secretary and a member of the board of directors of Casabianca and Maria Luisa Foden had been granted a general power of attorney by Casabianca's president. Finally, Deren states that on March 11, 1991, a meeting of the shareholders of Casabianca was held in Hartford with only the Fodens in attendance. According to the minutes, "[a]ll shares of the company issued and in circulation were present," and the shareholders resolved that Casabianca be dissolved. The Appellees asked the district court to order the Fodens to "provide any documents they have and [to] give testimony concerning the assets of Casabianca, and the current whereabouts of those assets," concluding that "[i]nformation about these assets is relevant to, and will be used in, the guardianship proceeding in the Chilean Court, in which the Guardians must file an inventory of [Ciro's] assets wherever they may be found."
 
 
 8
 On November 16, 1992, Chief Judge Cabranes granted the Appellees' application and issued subpoenas requiring the Fodens to produce documents and to appear for depositions. On January 8, 1993, the Fodens moved to vacate the order of judicial assistance and to quash the subpoenas. After briefing and oral argument, Chief Judge Cabranes orally denied the motions, holding that (1) all of the requirements of section 1782 had been satisfied, (2) section 1782 does not require that the evidence sought in the district court be discoverable under the laws of Chile, and (3) in any event, Chilean law empowers the Appellees to obtain the information requested. The Appellees and the Fodens stipulated to a stay of discovery pending this expedited appeal.
 
 DISCUSSION
 
 9
 We have jurisdiction over this appeal pursuant to 28 U.S.C. Sec. 1291. See In re Letters Rogatory Issued by the Director of Inspection of India, 385 F.2d 1017, 1018 (2d Cir.1967) (denial of motion to vacate discovery order and to quash subpoena issued pursuant to 28 U.S.C. Sec. 1782 constitutes final, appealable decision). We affirm, holding that section 1782 does not require the district court to make a finding of discoverability under the laws of the foreign jurisdiction. In addition, we hold that the district court's exercise of discretion was properly guided by the purposes of the statute.
 
 
 10
 I. History and Purposes of 28 U.S.C. Sec. 1782
 
 
 11
 An understanding of the history and purposes of 28 U.S.C. Sec. 1782 is an important first step in our inquiry. Section 1782, entitled "Assistance to foreign and international tribunals and to litigants before such tribunals," provides in pertinent part:
 
 
 12
 The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person.... The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing.
 
 
 13
 28 U.S.C. Sec. 1782(a).
 
 
 14
 Federal law has provided for some form of judicial assistance to foreign courts since 1855. See Act of March 2, 1855, ch. 140, Sec. 2, 10 Stat. 630 (allowing United States courts to compel testimony in response to letters rogatory from any court of a foreign country). However, early statutes granting judicial assistance were quite narrow in scope; for example, the statutes in effect from 1863 to 1948 required the foreign government receiving assistance to be a party or have an interest in the suit, and the suit had to be for the recovery of money or property. See In re Letter Rogatory from the Justice Court, Montreal, Canada, 523 F.2d 562, 564-65 (6th Cir.1975) (reviewing the history of predecessor statutes to section 1782). The evolutionary process from the 1855 act to the current statute, most recently amended in 1964, has generally been one of increasingly broad applicability. For example, the judicial assistance statute progressively has applied to suits for "the recovery of money or property," to "any civil action," to "any judicial proceeding," and finally, to "a proceeding in a foreign or international tribunal." See id. at 565 ("These changes have made the statute increasingly less restrictive and thus have evidenced the intent of Congress that the assistance be available to foreign governments in a greater number of instances.").
 
 
 15
 The 1964 amendments to section 1782 were drafted by the United States Commission on International Rules of Judicial Procedure, which was created by Congress in 1958. Pub.L. No. 85-906, 72 Stat. 1743, 1958 U.S.Code Cong. & Admin.News 2097. The amendments primarily (1) expanded the class of litigation in which section 1782 could be used by substituting the word "tribunal" for the word "court" and by adding international tribunals, (2) allowed not only foreign tribunals and officials to initiate the process, but also private litigants ("any interested person"), and (3) deleted the requirement that the foreign litigation actually be pending. Pub.L. No. 88-619, 78 Stat. 995, 997 (1964). The primary intent of the amendments was to "clarif[y] and liberalize[ ] existing U.S. procedures for assisting foreign and international tribunals and litigants in obtaining oral and documentary evidence in the United States." S.Rep. No. 1580, 88th Cong., 2nd Sess. (1964), reprinted in 1964 U.S.Code Cong. & Admin.News 3782, 3788 (hereinafter "Senate Report"). The desired effect was that "the initiative taken by the United States in improving its procedures will invite foreign countries similarly to adjust their procedures." Senate Report at 3783. We have recently characterized the purpose of these changes as the "twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." In re Malev Hungarian Airlines, 964 F.2d 97, 100 (2d Cir.) (Malev), cert. denied sub nom. United Technologies Int'l v. Malev Hungarian Airlines, --- U.S. ----, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992).
 
 II. "Discoverability" Requirement
 
 16
 The Fodens' primary argument on appeal is that section 1782 contains an implicit requirement that the material requested in the district court be discoverable under the laws of the foreign jurisdiction. The Fodens state that "[d]iscovery under Sec. 1782 is intended to give foreign litigants the opportunity to obtain from U.S. witnesses whatever kinds of information they could obtain within their own country, but not more." Recognizing that there is no Second Circuit case law directly on point, the Fodens assert that four of our sister circuits have recognized a discoverability requirement in section 1782, and that the reasoning in those cases is persuasive. See In re Application of Asta Medica, S.A., 981 F.2d 1, 7 (1st Cir.1992); In re Request from Crown Prosecution Service of United Kingdom, 870 F.2d 686, 692-93 & n. 7 (D.C.Cir.1989); Lo Ka Chun v. Lo To, 858 F.2d 1564, 1566 (11th Cir.1988); In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago, 848 F.2d 1151, 1156 (11th Cir.1988), cert. denied sub nom. Azar v. Minister of Legal Affairs of Trinidad and Tobago, 488 U.S. 1005, 109 S.Ct. 784, 102 L.Ed.2d 776 (1989); John Deere Ltd. v. Sperry Corp., 754 F.2d 132, 136 (3d Cir.1985). The Fodens argue that without a discoverability requirement, liberal United States discovery procedures would be unfairly imposed on those parties to foreign proceedings present in the United States or with United States ties, "upset[ting] the balance between litigants that each nation creates within its own judicial system" and effectively amending foreign law regarding the compulsory production of evidence as it applies to litigants with connections to the United States.
 
 
 17
 Chief Judge Cabranes rejected the Fodens' argument that section 1782 requires discoverability, finding "nothing in the text of section 1782 [requiring] that the law of the foreign tribunal provide for discovery of the information sought in the United States" and holding that the requirements of section 1782 had been fully met by the Appellees. We ordinarily review for abuse of discretion a district court's grant of discovery under section 1782. See Malev, 964 F.2d at 99. However, the question of whether section 1782 imposes limitations on the district court's exercise of discretion is a question of law, which we review de novo. See United States v. Edwards, 960 F.2d 278, 281 (2d Cir.1992) ("The interpretation of a federal statute is a question of law which we review de novo."); see also Asta Medica, 981 F.2d at 4 (reviewing de novo the question of whether a district court's discretion under section 1782 is limited by the requirement of discoverability). We agree with the district court that section 1782 does not impose the requirement that the material sought in the United States be discoverable under the laws of the foreign jurisdiction.
 
 
 18
 We start, as we must, with the language of the statute. See United States v. Ron Pair Enterprises, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.' ") (quoting Griffin v. Oceanic Contractors, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). The statutory language is unambiguous in its requirements: (1) the person from whom discovery is sought must reside or be found in the district of the district court to which the application is made, (2) the discovery must be "for use in a proceeding in a foreign or international tribunal," and (3) the application must be made "by a foreign or international tribunal" or by "any interested person." The language makes no reference whatsoever to a requirement of discoverability under the laws of the foreign jurisdiction. Indeed, the only language in section 1782 arguably relevant to the issue of whether the district court must adopt the discovery requirements of the foreign jurisdiction is permissive language, stating that the practice and procedure prescribed by the district court "may be in whole or part the practice and procedure of the foreign country or the international tribunal." 28 U.S.C. Sec. 1782(a) (emphasis added). As we recently made clear in Malev, we are not free to read extra-statutory barriers to discovery into section 1782. 964 F.2d at 100.
 
 
 19
 In Malev, appellant Malev had filed an application for discovery pursuant to section 1782 for use in a proceeding before a Hungarian court. The district court denied the discovery request and on appeal we reversed and remanded, holding that the district court had abused its discretion by relying on improper factors in its denial of discovery. The district court had based its decision primarily on the ground that Malev's section 1782 application was " 'premature and unnecessary' " because Malev had " 'never made a formal discovery request upon [the appellees] before the Hungarian Court.' " Malev, 964 F.2d at 100. The district court's other grounds for denial were that the Hungarian court had failed to make a request for assistance to the district court and that if the district court granted the requested discovery, it would be forced to bear the onerous burden of supervising reciprocal discovery. In holding each of the district court's grounds improper, we turned to the unambiguous language of section 1782. Id. at 100-01. We found "nothing in the text of 28 U.S.C. Sec. 1782 which would support a quasi-exhaustion requirement of the sort imposed by the district court," and held that district courts may not impose such "extra-statutory barriers to obtaining discovery." Id. at 100. We further held that the district court's requirement that the foreign court make a request for assistance would impermissibly read the language "upon the application of any interested person" out of section 1782 and that section 1782 does not contain any requirement that the district court supervise reciprocal discovery. Id. at 101.
 
 
 20
 As we also pointed out in Malev, a literal reading of the unambiguous language of section 1782 comports with the purposes and legislative history of the statute. Id. at 100-01. The Senate Report makes clear that the 1964 amendments were intended to leave the district courts with wide discretion in granting relief under section 1782:
 
 
 21
 [Section 1782(a) ] leaves the issuance of an appropriate order to the discretion of the court which, in proper cases, may refuse to issue an order or may impose conditions it deems desirable. In exercising its discretionary power, the court may take into account the nature and attitudes of the government of the country from which the request emanates and the character of the proceedings in that country, or in the case of proceedings before an international tribunal, the nature of the tribunal and the character of the proceedings before it.
 
 
 22
 Senate Report at 3788. The Chairman of the Advisory Committee to the United States Commission on International Rules of Judicial Procedure expressed a similar viewpoint: " '[Section 1782] is a one-way street. It grants wide assistance to others, but demands nothing in return. It was deliberately drawn this way.' " Malev, 964 F.2d at 101 (quoting Amram, The Proposed International Convention on the Service of Documents Abroad, 51 A.B.A.J. 650, 651 (1965)). Given that the statutory language is silent and the legislative history indicates that "[i]n exercising its discretionary power, the court may take into account the nature and attitudes of the government of the country from which the request emanates and the character of the proceedings in that country," Senate Report at 3788 (emphasis added), we find it difficult to believe that Congress actually intended section 1782 to have an implicit requirement that any evidence sought in the United States be discoverable under the laws of the foreign country. If Congress had intended to impose such a sweeping restriction on the district court's discretion, at a time when it was enacting liberalizing amendments to the statute, it would have included statutory language to that effect. As we discuss in Part III below, district judges may well find that in appropriate cases a determination of discoverability under the laws of the foreign jurisdiction is a useful tool in their exercise of discretion under section 1782. We hold, however, that no such threshold requirement exists in the statute.
 
 
 23
 The Fodens cite First and Eleventh Circuit decisions that explicitly read a discoverability requirement into section 1782 and argue that the reasoning in those decisions is persuasive.[1] See Asta Medica, 981 F.2d at 7; Lo Ka Chun, 858 F.2d at 1566; Trinidad and Tobago, 848 F.2d at 1156. We disagree. In Asta Medica, the First Circuit held that the district court's discretion under section 1782 was "limited by the restriction [of discoverability] that we find ... to be implicitly required by section 1782, based upon its history, rationale, and the policy considerations we have discussed." 981 F.2d at 7. The policy considerations cited are: maintaining the balance between litigants that each nation creates within its own judicial system, preventing circumvention of foreign restrictions on discovery and avoiding offense to foreign tribunals. We agree that each of these is a legitimate policy consideration and that the legislative history indicates that these concerns were part of the motivation for the legislation. However, we disagree with the First Circuit's holding that, as a result of these concerns, Congress intended section 1782 to have an implied discoverability requirement. Instead, we believe Congress intended that these concerns be addressed by a district judge's exercise of discretion. See Senate Report at 3788 ("[section 1782] leaves the issuance of an appropriate order to the discretion of the court"); see also Amram, Public Law No. 88-619 of October 3, 1964--New Developments in International Judicial Assistance in the United States of America, 32 D.C.B.J. 24, 31 (1965) (under section 1782, "[t]he grant of power is unrestricted, but entirely within the discretion of the Court").
 
 
 24
 The Eleventh Circuit also explicitly has held that section 1782 requires a finding of discoverability under the laws of the foreign jurisdiction. Lo Ka Chun, 858 F.2d at 1566; Trinidad and Tobago, 848 F.2d at 1156. In Trinidad and Tobago,[2] the court states that the discoverability requirement exists and in support cites John Deere, 754 F.2d at 136, and a district court case, In re Court of the Comm'r of Patents for South Africa, 88 F.R.D. 75, 77 (E.D.Pa.1980). Trinidad and Tobago, 848 F.2d at 1156. In John Deere, however, the Third Circuit merely decided that section 1782 does not require (1) that the foreign courts have similar judicial assistance procedures, or (2) that the evidence sought be admissible under the rules of evidence of the foreign jurisdiction. 754 F.2d at 135-36. John Deere is not a case about whether section 1782 requires discoverability, and the court never explicitly states that such a requirement exists. The Fodens, however, point to the court's language in John Deere that on the facts before it the discoverability requirement has been met, and that "[a] grant of discovery that trenched upon the clearly established procedures of a foreign tribunal would not be within section 1782." Id. at 135. The Fodens also note the court's "[c]oncern that foreign discovery provisions not be circumvented by procedures authorized in American courts." Id. at 136. Nonetheless, we are unconvinced that these general concerns of the John Deere Court require the reading of an absolute discoverability requirement into section 1782. See id. at 136 n. 3 (quoting the language of the Senate Report concerning section 1782's grant of discretionary power to the district courts and stating that "[i]t is doubtful whether such language can be expanded to impose a requirement that district courts predict or construe the procedural or substantive law of the foreign jurisdiction").[3]
 
 III. Abuse of Discretion
 
 25
 The Fodens argue that even if section 1782 does not contain a discoverability requirement and consequently the district court did not err as a matter of law, the court nonetheless "abused its discretion in this case by issuing an order that will defeat important purposes of the statute." The Fodens assert that, according to their expert on Chilean law, in Chile "there is no pretrial discovery as we know it in the United States" and no compulsory process would be available in Chile to aid in the inventory of Ciro's assets. The Fodens then set out a parade of horribles that would result if we were to uphold the district court's grant of discovery, such as (1) granting to foreign litigants power to obtain information that they would not have in their home jurisdiction, thereby "ignoring principles of comity and risking offense to a friendly foreign sovereign," and (2) "opening the federal courts to a deluge of foreign litigants seeking to avoid the restrictions on pretrial discovery procedures in their own jurisdictions."
 
 
 26
 In his oral opinion, Chief Judge Cabranes first held that all of the requirements of section 1782 had been met and that discoverability was not a requirement of the statute. He then continued, in pertinent part:
 
 
 27
 In any event, the court finds that the law of Chile empowers the provisional guardians to obtain the information about Ciro Gianoli's assets. The provisional guardians have a duty to compile an inventory of Ciro Gianoli's assets by order of the Chilean court ... [and] under Article 378 of the Civil Code of Chile.... It is difficult, if not impossible, to conclude that a court that orders an inventory of this sort does not have the power to inquire into assets abroad so that the required inventory can be complete.
 
 
 28
 In fact, both parties agree that the Chilean court could issue a letter rogatory to inquire about assets that should be included in the required inventory ... and that the enforcement of a letter rogatory would be governed by the law of the receiving nation, here the United States....
 
 
 29
 Finally, it is clear from the record that obtaining the information from the Fodens would not be an affront to the Chilean court or the Chilean sovereignty. It is clear that allowing the depositions to proceed would actually assist the Chilean court in its ongoing proceedings. In fact, the law of Chile does not prohibit a litigant from gathering evidence through methods that are lawful in the place where those methods are undertaken.
 
 
 30
 (citations omitted).
 
 
 31
 In Malev, we held that the "twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts must inform our analysis of whether the district court abused its discretion." 964 F.2d at 100. Because the district court's exercise of discretion properly was guided by the purposes of section 1782, we hold that the court did not abuse its discretion. Although the district court did not make a finding as to the parties' ability to obtain pre-trial discovery under Chilean law, it clearly made an inquiry into whether its grant of discovery under section 1782 would circumvent Chilean restrictions on discovery and whether its grant of discovery would be an affront to the Chilean court or Chilean sovereignty. In this way the district court assured that section 1782's purposes, especially that of encouraging international cooperation, were being furthered by the court's actions and not hindered.
 
 
 32
 Given that the guardians had been ordered by the Chilean court to compile an inventory of Ciro's assets, Chief Judge Cabranes reasonably found that it was highly unlikely that the Chilean court would not have the power to "inquire into assets abroad so that the required inventory can be complete." Because, as Chief Judge Cabranes also found, litigants in Chile are not prohibited from "gathering evidence through methods that are lawful in the place where those methods are undertaken," a grant of discovery under section 1782 would be unlikely to circumvent Chilean discovery restrictions. Finally, Chief Judge Cabranes reasonably found that because the district court's grant of discovery clearly would aid the Chilean court in obtaining a complete inventory, discovery under section 1782 would "not be an affront to the Chilean court or the Chilean sovereignty." Thus, despite no specific finding as to the availability under Chilean law of pre-trial discovery of the information sought, Chief Judge Cabranes satisfied himself that granting the section 1782 application on the facts before him would not be counter to the statute's "twin purposes." Because the district court's exercise of discretion was thus properly guided, we find no abuse of discretion. The parade of horribles predicted by the Fodens in the absence of extra-statutory restrictions on section 1782 is unlikely to occur given that district courts, in exercising their discretion, are not free to ignore the purposes underlying the statute.
 
 IV. "Adjudicative Proceeding" Requirement
 
 33
 Finally, the Fodens argue that section 1782's requirement that discovery be granted only "for use in a proceeding in a foreign or international tribunal" has not been met in this case. The Fodens contend that "[t]he compiling of the inventory is not an adjudicative proceeding, but rather a non-contentious, unilateral task that the provisional guardians must complete before assuming guardianship." This argument is without merit. Ciro's incompetency proceeding before the Third Civil Court in Santiago, Chile is a "proceeding in a foreign ... tribunal." The evidence sought in the district court pursuant to the order of the Chilean court is clearly "for use in" the proceeding. Whether or not the compilation of the inventory is contentious or adjudicative is irrelevant, because it is part of the incompetency proceeding.
 
 CONCLUSION
 
 34
 We affirm the district court's grant of discovery against the Fodens pursuant to 28 U.S.C. Sec. 1782. We hold that section 1782 does not contain a requirement that the material requested in the district court be discoverable under the laws of the foreign jurisdiction. Finally, we hold that the district court, by looking to the congressional purposes behind section 1782, properly informed its exercise of discretion.
 
 
 
 [1]
 The Fodens claim that decisions of the District of Columbia and Third Circuits also "recognize[ ] the discoverability requirement." See Crown Prosecution Service, 870 F.2d at 687, 692-93 & n. 7; John Deere, 754 F.2d at 135-36. Neither case concerns whether section 1782 requires a showing of discoverability under the laws of the foreign jurisdiction. At issue in Crown Prosecution Service are proper evidence-taking procedures pursuant to section 1782. The case merely cites Trinidad and Tobago and John Deere in support of the proposition that "[t]he district court should have inquired more closely whether the projected evidence-taking procedure 'represents the British practice,' when use of the evidence in court is anticipated." Crown Prosecution Service, 870 F.2d at 692 (citations and footnote omitted). John Deere, as discussed in Part II, is a case about reciprocity and admissibility
 
 
 [2]
 Lo Ka Chun cites Trinidad and Tobago as support for the discoverability requirement
 
 
 [3]
 In the district court case cited by the Third Circuit, Court of the Comm'r of Patents for South Africa, the district court did not hold that section 1782 requires that a finding of discoverability be made prior to granting discovery under the statute. Instead, the court properly considered that "Congress expects the district courts to grant requests that will spur a reciprocity of cooperation," and held that under the facts before it, this purpose of the statute would be defeated by a grant of discovery. 88 F.R.D. at 77; see also Part III. The court found discoverability to be a useful guide to its exercise of discretion in the case before it because the Commissioner of Patents was not represented in the action and the court had grounds to believe that the applicant was attempting to circumvent South African discovery restrictions. 88 F.R.D. at 77