In the matter of the Application of EUROMEPA S.A., formerly known as P.N.C. S.A.; successor in interest of Mepa France, S.A. and Allied Insurance & Reinsurance Company, Petitioner–Appellants,

v.

R. ESMERIAN, INC., Respondent–Appellee.

No. 606, Docket 94–7523.

United States Court of Appeals, Second Circuit.

Argued Nov. 22, 1994.

Decided March 20, 1995.

Constantino P. Suriano, Jeffrey C. Crawford, Mound Cotton and Wollan, New York City, for appellants.

Barton Legum, Merideth M. Brown, Carl Micarelli, Debevoise & Plimpton, New York City, for appellee.

Before: OAKES, JACOBS and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

This case raises the question of the degree to which federal district courts, in deciding whether to order discovery under 28 U.S.C. § 1782(a) in aid of a foreign litigation, should delve into the mysteries of foreign law.

## BACKGROUND

Euromepa, S.A., a French insurance brokerage firm, and Allied Insurance and Reinsurance Company, an affiliated underwriter of commercial risk coverage (hereinafter collectively referred to as "MEPA") appeal from the judgment of the United States District Court for the Southern District of New York

(Duffy, J.), denying their petition for court-ordered discovery pursuant to 28 U.S.C. § 1782(a).[1] *See Application of Euromepa, S.A.*, 155 F.R.D. 80 (S.D.N.Y.1994). MEPA requested that the district court direct Ralph Esmerian, Inc., a New York jewelry designer, to produce both witnesses for deposition and documents for use in a pending French litigation. The underlying dispute involves a claim that MEPA breached its duty as an insurance agent by failing to inform its insured, Esmerian's intermediary jewelry dealer, that a proposed gem courier was untrustworthy. MEPA's misrepresentations regarding the courier's honesty induced Esmerian's intermediary to cancel its employee "infidelity" coverage. Inevitably, the courier absconded with $26 million of Esmerian's gems.

After a trial, the Tribunal de Commerce de Nanterre, France found MEPA liable to Esmerian for $10,127,500. MEPA has appealed the judgment to the Cour d'Appel de Versailles (the "French Court of Appeal"), which will hear and consider new evidence— not introduced at trial—as part of the French appellate process. In aid of its French appeal, MEPA sought deposition and document discovery from Esmerian under section 1782.

After reviewing the parties's conflicting submissions on French procedural law, the district court concluded that

> the elected representatives of France have, as a matter of policy, determined that pretrial discovery and use of evidence is controlled by the court and not by the parties.... Granting this petition would undeniably infringe on the power that the French legislature has bestowed on its courts. MEPA, instead of the French Court, would control the process by which any evidence was obtained and submitted. Such a decision would be contrary to the policy formulated and instituted by the French Legislature.

1. In relevant part, the statute provides:

> The district court of the district in which a person resides or is found may order him to give testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. The order may be made pursuant to ... the appli-

*Id.* at 83. Exercising the discretion to withhold discovery assistance provided by section 1782, *see* 28 U.S.C. § 1782 (the district court "*may* order" discovery) (emphasis added), Judge Duffy denied MEPA's petition.

■ We review the district court's decision for abuse of discretion. *See In re Malev Hungarian Airlines*, 964 F.2d 97, 99 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992). But to say that a district court may or may not, in its discretion, order discovery, does not mean that it is free to do so on inappropriate grounds. In this case, we conclude that the district court misapplied our guiding precedents, and misperceived the extent to which it should construe foreign law in deciding whether to order discovery. We therefore reverse the district court's judgment and remand the case for further consideration.

## DISCUSSION

### I.

We have previously instructed the district courts in this Circuit to evaluate discovery requests under section 1782 in light of the statute's "twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts...." *Malev*, 964 F.2d at 100. We have also noted that Congress purposefully engineered section 1782 as "'a one-way street. It grants wide assistance to others, but demands nothing in return.'" *Id.* at 101 (quoting Amram, *The Proposed International Convention on the Service of Documents Abroad*, 51 A.B.A.J. 650, 651 (1965)); *see also John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132, 135 (3d Cir.1985) (section 1782 "does not require reciprocity as a predicate to the grant of a discovery order").

> cation of any interested person [and] ... [t]o the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.
> 28 U.S.C. § 1782(a).

Relying on the plain language of the statute, this Court has also refused to engraft a "quasi-exhaustion requirement" onto section 1782 that would force litigants to seek "information through the foreign or international tribunal" before requesting discovery from the district court. *Malev,* 964 F.2d at 100. By the same reasoning, we have also rejected "any implicit requirement that any evidence sought in the United States be discoverable under the laws of the foreign country." *In re Application of Aldunate,* 3 F.3d 54, 59 (2d Cir.) ("If Congress had intended to impose such a sweeping restriction on the district court's discretion, at a time when it was enacting liberalizing amendments to the statute, it would have included the statutory language to that effect."), *cert. denied,* —— U.S. ——, 114 S.Ct. 443, 126 L.Ed.2d 376 (1993). Instead, we held that the discoverability of requested material under foreign law is simply one factor that a district judge may consider in the exercise his or her discretion. *See id.* at 60.

■ In this case, the district court denied MEPA's discovery request after conducting an analysis that runs counter to the principles set forth in *Malev, Aldunate, John Deere, Ltd.* and, we believe, in the statute itself. To start, the district judge noted that "a mechanism was available for MEPA to seek [specific] documents while in French courts," and then remarked disapprovingly that "MEPA failed to even attempt to use the mechanism provided by French procedure for obtaining documents." *Euromepa,* 155 F.R.D. at 83. In essence, this criticism faults MEPA for having failed to exhaust its discovery options in France before seeking assistance in this country, and thus embodies the "extra-statutory barrier[ ] to obtaining discovery" that we explicitly rejected in *Malev.* 964 F.2d at 100.

Recognizing *Malev's* "non-exhaustion" rule, the district court sought to bypass it by linking MEPA's failure to exhaust its French discovery options to an additional factor that the court believed weighed against granting MEPA's request. Judge Duffy concluded that "MEPA's failure to seek production of documents and witnesses through the French courts cannot be disregarded when consider-

ing 'the nature and attitudes' of France toward discovery." *Euromepa,* 155 F.R.D. at 83 (quoting S.Rep. No. 1580, 88th Cong., 2d Sess. (1964), *reprinted in* 1964 U.S.C.C.A.N. 3782, 3788 [hereinafter *"Senate Report"*] ). On its face, this consideration seems to be just another way of examining whether the evidence that MEPA seeks in the United States is ultimately discoverable under French law. And linking an impermissible factor (lack of exhaustion) to a factor whose relevance we have held to be quite limited under the statute (lack of discoverability) cannot suffice to justify a denial of discovery.

The district court, however, sought to distinguish its inquiry into the "attitudes" of the French towards discovery from a discoverability analysis by stating that

[w]hether the evidence MEPA seeks would be discoverable in France or not is unknown and irrelevant to me. My decision is based on the determination that granting this petition would be an unwarranted intrusion into France's system of evidence gathering.

*Euromepa,* 155 F.R.D. at 84 n. 2. We take this to mean that the court below was not so much concerned with whether comparable discovery exists under French law, but with whether France would in some sense be offended by our grant of discovery and, therefore, view it as an "unwarranted intrusion."

There is some support for this distinction. In *Aldunate,* we acknowledged "that in appropriate cases a determination of discoverability under the laws of the foreign jurisdiction is a useful tool in [a district judge's] exercise of discretion under section 1782." 3 F.3d at 60. That appeal involved a section 1782 petition filed in aid of a Chilean incompetency hearing. The district court granted the petition, concluding that the requested discovery "would not be an affront to the Chilean court or the Chilean sovereignty" because "allowing the depositions to proceed would actually assist the Chilean court in its on-going proceedings." *Id.* at 61. On review, we took note that "the district court did not make a finding as to the parties' ability to obtain pre-trial discovery under Chilean law," but we did not consider this problematic. Rather, we approved the discovery order

because the district court "clearly made an inquiry into whether its grant of discovery under section 1782 would circumvent Chilean restrictions on discovery and whether its grant of discovery would be an affront to the Chilean court or Chilean sovereignty." *Id.*

The present case requires us to consider the appropriate scope of this "inquiry" into the likelihood that providing section 1782 discovery assistance to foreign litigants will offend a foreign tribunal.

## II.

We do not believe that an extensive examination of foreign law regarding the existence and extent of discovery in the forum country is desirable in order to ascertain the attitudes of foreign nations to outside discovery assistance. For, as a chief architect of section 1782's current version recently stated:

> [the statute's] drafters realized that making the extension of American assistance dependant on foreign law would open a veritable Pandora's box. They definitely did not want to have a request for cooperation turn into an unduly expensive and time-consuming fight about foreign law. That would be quite contrary to what they sought to be achieved. They also realized that, although civil law countries do not have discovery rules similar to those of common law countries, they often do have quite different procedures for discovering information that could not properly be evaluated without a rather broad understanding of the subtleties of the applicable foreign system. It would, they judged, be wholly inappropriate for an American district court to try to obtain this understanding for the purpose of honoring a simple request for assistance.

Hans Smit, *Recent Developments in International Litigation*, 35 S.Tex.L.J. 215, 235 (1994) [hereinafter *Recent Developments* ].[2]

The Third Circuit has already tempered the need to engage in an extensive foreign law analysis under section 1782. Addressing the reference in the statute's legislative history to the relevance of the "nature and attitudes of the Government of the country from which the [discovery] request emanates," the court read the drafters' statements as simply "authoriz[ing] district courts to scrutinize the underlying fairness of the foreign proceedings to insure they comply with notions of due process." *John Deere, Ltd.*, 754 F.2d at 136 n. 3 (citing *Senate Report* at 3788). According to the court, it was "doubtful whether such language can be expanded to impose a requirement that district courts predict or construe the procedural or substantive law of the foreign jurisdiction." *Id.* Thus, the Third Circuit concluded that "[t]o require that a district court undertake a more extensive inquiry into the laws of the foreign jurisdiction would seem to exceed the proper scope of section 1782." *Id.* at 136.

We agree with this interpretation and conclude that the district court's analytic approach promoted the very thing that section 1782 was intended to avoid. The record reveals that this litigation became a battle-by-affidavit of international legal experts, and resulted in the district court's admittedly "superficial" ruling on French law. *Euromepa*, 155 F.R.D. at 82. We think that it is unwise—as well as in tension with the aims of section 1782—for district judges to try to glean the accepted practices and attitudes of other nations from what are likely to be conflicting and, perhaps, biased interpretations of foreign law. Although "[a] grant of discovery that trenched upon the *clearly established* procedures of a foreign tribunal would not be within section 1782," *John Deere, Ltd.*, 754 F.2d at 135 (emphasis added), we do not read the statute to condone speculative forays into legal territories unfamiliar to federal judges. Such a costly, time-

---

2. Another commentator has noted that beginning section 1782 cases "with a debate over foreign discovery law ... would ... place a significant burden on the litigants and the federal district courts." Walter B. Stahr, *Discovery Under 28 U.S.C. § 1782 for Foreign and International Proceedings*, 30 Va.J.Int'l L. 597, 613 (1990) (foot-notes omitted). The author goes on to state, however, that in cases where "one party to the foreign litigation seeks discovery from another party to the foreign litigation" under section 1782, consideration of "foreign discoverability may be relevant." *Id.*

consuming, and inherently unreliable method of deciding section 1782 requests cannot possibly promote the "twin aims" of the statute.

Rather, we believe that a district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782. Such proof, as embodied in a forum country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures,[3] would provide helpful and appropriate guidance to a district court in the exercise of its discretion.[4] Absent this type of clear directive, however, a district court's ruling should be informed by section 1782's overarching interest in "providing equitable and efficacious procedures for the benefit of tribunals and litigants involved in litigation with international aspects." *Senate Report* at 3783; *cf. Aldunate*, 3 F.3d at 62 ("despite no specific finding as to the availability under Chilean law of pre-trial discovery . . ., [the district judge] satisfied himself that granting the section 1782 application on the facts before him would not counter the statute's 'twin purposes' ").[5]

## III.

■ In this case, the district court's denial of MEPA's discovery request was apparently most influenced by a cautious desire not to step on French toes. *See Euromepa*, 155

---

3. MEPA cites a useful example of the type of authoritative statement to which we refer. In *South Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.*, 3 W.L.R. 398 (Eng.1986), a party to a British litigation sought third-party discovery under section 1782 in the United States District Court for the District of Washington. Pre-trial discovery of this sort was not permitted under English procedures and the trial judge enjoined it on the grounds that "the English court should retain control of its own procedure and the proceedings that are before it." *Id.* at 403. The intermediate appellate court affirmed the trial judge's order stating,

> [o]nce the parties have chosen or accepted the court in which their dispute is to be tried they must abide by the procedure of that country and that court must be master of its own procedure. . . . [I]f a party fighting a case in this country has to face the prospect of fighting procedural battles in whatever other jurisdiction his opponent may find a procedural advantage it may impose intolerable burdens, and encourage the worst and most oppressive form of procedural forum shopping. We should set our face against any such situation developing.

*Id.*

On appeal, the House of Lords rejected the lower courts' reasoning and vacated the injunction. The Law Lords held that the contested discovery was not "conduct which is oppressive or vexatious or which interferes with the due process of the [British] court," *id.* at 409, and thus did not "amount to unconscionable conduct" warranting an injunction. *Id.* at 410.

4. Even when such a foreign declaration exists, a district judge, in properly exercising discretion, would still have to compare the facts of the case then currently before the court to the foreign precedent cited by the party opposing the section 1782 petition and determine whether the two contexts are sufficiently analogous to warrant a denial of discovery. Of course, any and all other limitations upon discovery that would be available under Fed.R.Civ.P. 26 (particularly subparagraphs (b) and (c)), pertaining both to privileged and trial preparation matters and to protective orders, are also available under section 1782(a) as the district court may provide.

5. The case before us illustrates dramatically the dangers of seeking to discern foreign attitudes by an examination of discoverability. After Judge Duffy's decision and just prior to oral argument, Esmerian requested us to take judicial notice of certain documents that MEPA had recently submitted in the French proceedings. According to Esmerian, MEPA

> filed a request in the French Court of Appeal for the production of evidence that was substantially identical to that which [MEPA] requested in the District Court. . . . Apparently satisfied with the documents subsequently produced by [Esmerian] to the French Court of Appeal, [MEPA] then withdrew [its] request for a ruling by the French court.

Appellee's Notice of Motion to Take Judicial Notice of Documents at 2.

This motion proved too much. In its papers, Esmerian argued that these "documents confirm the District Court's findings that . . . the evidence sought in the U.S. was available to [MEPA] through French procedure and that the use of American discovery rules would not promote the efficiency of the French appeal." *Id.* But if this is so, if the requested evidence *is* in fact available through French procedure, then a grant of the same discovery under section 1782 is not likely to offend French sovereignty. *See Aldunate*, 3 F.3d at 62; *John Deere, Ltd.*, 754 F.2d at 137–38. Thus, Esmerian's argument, after undercutting Judge Duffy's reasoning, reduced itself to one that is based upon MEPA's failure to exhaust French procedural options, which, as already noted, we explicitly rejected in *Malev*. *See* 964 F.2d at 101.

F.R.D. at 83 ("Granting this petition would undeniably infringe on the power that the French legislature has bestowed to its courts."). Since no authoritative declarations by French judicial, executive or legislative bodies objecting to foreign discovery assistance appear in the record, we are unable to accept the district court's conclusion that granting MEPA's discovery request will in fact offend the people of France.

We specifically disagree with the district court's finding that a grant of discovery under section 1782 would allow "MEPA, instead of the French Court, [to] control the process by which any evidence was obtained and submitted." *Euromepa*, 155 F.R.D. at 83. Whether or not American courts offer assistance to French litigants, we are confident that French courts will remain at all times the masters of their own *domaine*. As Judge Duffy recognized, once parties submit themselves to the jurisdiction of a French court, they "must comply with all orders of the French court or face punitive measures." *Euromepa*, 155 F.R.D. at 83.

Because the French court can always enjoin MEPA from pursuing discovery in a manner that violates the judicial policies of France, or can simply refuse to consider any evidence that MEPA gathers by what might be—under French procedures—an unacceptable practice, we do not think that the district court's concern for trespassing upon the prerogatives of French sovereignty should have weighed so heavily in its decision. France can quite easily protect itself from the effects of any discovery order by the district court that inadvertently offended French practice. *See Recent Developments* at 235–36 ("Since foreign courts could always rule upon the propriety of reliance on evidence obtained through the cooperation extended by American courts when it was presented to them, the drafters of section 1782 regarded it as both unnecessary and undesirable to let the propriety of discovery with the aid of an American court depend on discoverability and admissibility under foreign law.").

Provided that a district court reasonably attempts to accommodate the evidence-gathering practices of other nations, it need not err on the side of completely withholding discovery assistance from international litigants. After all, a foreign tribunal's corrective response to a well-intentioned but unwelcome grant of discovery could bar the evidence gathered in the given case, and it could also constitute the kind of authoritative declaration mentioned earlier that would provide helpful instruction to American courts in handling future cases. *Cf. South Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.*, 3 W.L.R. 398 (Eng.1986) (vacating lower court injunction restraining litigants in a British court from conducting section 1782 pre-trial discovery in the United States). Since section 1782 contemplates international cooperation, and such cooperation presupposes an on-going dialogue between the adjudicative bodies of the world community, such a result would be far from undesirable.

## IV.

▪ There are, admittedly, many ways in which a blanket, "American-style" grant of discovery to one side in a foreign lawsuit may confuse or skew that litigation. But because "section 1782 gives the court complete discretion in prescribing the procedure" for parties to follow in producing requested materials, *Senate Report* at 3789, we think that it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright. *See Malev*, 964 F.2d at 102 (noting that a district court has broad authority under section 1782 and Fed.R.Civ.P. 26 to impose reasonable limitations and conditions upon discovery).[6]

▪ Here, the district judge was particularly concerned that by permitting the requested discovery he would allow MEPA to "examine documents that it may not wish to

---

6.  Of course, if the district court determines that a party's discovery application under section 1782 is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials, the court is free to deny the application in toto, just as it can if discovery was sought in bad faith in domestic litigation.

use in court"—something that French discovery rules may well bar. *Euromepa,* 155 F.R.D. at 83. But this consideration certainly did not warrant the district court's extreme response. In order to "maintain[ ] the balance between litigants that each nation creates within its own judicial system," *Aldunate,* 3 F.3d at 60, the district court was free to insist that MEPA submit any evidence that it obtained in this country to the French Court of Appeal, regardless of whether the evidence helped or hindered MEPA's defense to Esmerian's claim.

Similarly, the district court may have been concerned—and if so, quite correctly—that MEPA could obtain discovery against Esmerian in the United States, while Esmerian would be unable to gain access to analogous MEPA documents or testimony in Europe. But if the district court wished to insure procedural parity between MEPA and Esmerian, it could have conditioned relief upon the parties' reciprocal exchange of information. *Cf. Malev,* 964 F.2d at 101–02 & n. 4 (although a district court is "free to grant [a section 1782] request without assuming responsibility for supervising" reciprocal discovery arrangements, a district court "can, of course, accept [a party's] offer to engage in reciprocal discovery").

On remand, the district court should consider these and other options in crafting an appropriate discovery order.

## CONCLUSION

We read section 1782's investment of broad discretion in the district courts as an invitation for district judges to fashion creative means of implementing the statute's double goal: promoting efficiency in international litigation and persuading other nations, by example, to do the same. Absent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance. Accordingly, we reverse the district court's denial of MEPA's section 1782 petition, and remand for further proceedings.

JACOBS, Circuit Judge, dissenting:

I respectfully dissent. The majority opinion asks to what degree federal district courts "should delve into the mysteries of foreign law" in deciding petitions for discovery under 28 U.S.C. § 1782(a). I would reframe the question presented on this appeal to ask what inquiry concerning the foreign forum and its discovery mechanisms is appropriate where the petition under section 1782 seeks American-style discovery: whole categories of documents and multiple depositions.[1]

In its answer, the majority opinion alters law and precedent in three ways that are unnecessary and unwise. First, we have previously recognized that the discoverability abroad of material sought to be discovered here is a useful tool assisting district court discretion; the majority opinion rules that the relevance of that factor is "quite limited", and proceeds to disregard it. Second, we have previously counseled deference to attitudes of the foreign forum toward discovery; the majority opinion withdraws such deference except where there is "authoritative proof" that the foreign tribunal would "reject" our granting discovery assistance. Third, the majority opinion effectively limits the district court's statutory discretion to the crafting of "closely tailored discovery order[s] rather than [the denial of] relief outright."

1. The petitioner seeks the deposition of unspecified employees of Ralph Esmerian, Inc. and sixteen categories of documents relating to the jewelry that is the subject matter of the litigation in France, *e.g.:*

\* \* \* \* \* \*

6. Documents, communications, memoranda, correspondence, contracts, invoices, sales agreements, or entrustments, between Esmerian and others relating to the Jewelry during the years 1988 to the present.

7. Documents, communications, memoranda, correspondence, contracts, invoices, or other written material among or between or reflecting communications among or between Esmerian, Wolfers, Wolfers Zug, Fakhreddin, Corvina, Guillaume, and George Chalhoub, MEPA and/or Allied.

\* \* \* \* \* \*

10. All documents which substantiate the exact amount of loss that Esmerian allegedly suffered.

I prefer the district court's approach. *See Application of Euromepa, S.A.,* 155 F.R.D. 80 (S.D.N.Y.1994). The district court evaluated the request for discovery assistance in light of the contesting parties (the plaintiff and defendant abroad), the nature of the material sought (extensive), the status of the foreign proceeding (on appeal), the overall scope and role of discovery in the foreign forum (curtailed), and its attitude toward American-style discovery (disfavor). After reviewing these factors, the district court concluded that "granting [MEPA's] petition would infringe on the French courts while not promoting the efficiency of the pending appeal in France." *Id.* at 84. That approach is consonant with the purpose and design of the statute.[2]

A. *Discoverability.* Other circuits have read into section 1782 the requirement that the discovery sought here be of a kind discoverable in the foreign forum. *See In re Application of Asta Medica, S.A.,* 981 F.2d 1, 7 (1st Cir.1992); *Lo Ka Chun v. Lo To,* 858 F.2d 1564, 1566 (11th Cir.1988). We have ruled that discoverability in the foreign jurisdiction is not a prerequisite to granting a section 1782 request for assistance, but that it is a "useful tool" for the district judge in exercising discretion. *See In re Application of Aldunate,* 3 F.3d 54, 60, 62 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 443, 126 L.Ed.2d 376 (1993). Here, the district court expressly stated that it was not relying on whether the material sought by MEPA was discoverable under the laws of France,[3] and proceeded to consider the issue in light of the "twin aims" of the statute: to "balance ... the policy of not infringing upon a foreign nation's procedural rules with the policy of promoting the efficient resolution of dispute in a foreign tribunal." *Euromepa,* 155 F.R.D. at 82. In so doing, the district court

observed that "MEPA failed to even attempt to use the mechanism provided by French procedure for obtaining documents." *Id.* at 83. The majority opinion re-casts that observation as an impermissible requirement that MEPA exhaust its efforts to obtain this discovery in France before seeking section 1782 assistance, and emphasizes that the relevance of discoverability is "quite limited". I think that it was appropriate for the district court to consider that American discovery is sought here—by one party against another party—as a substitute for discovery in France rather than as an aid and supplement to the procedures of a French tribunal. MEPA's petition was filed after the conclusion of the trial in France. Whatever pretrial discovery is or is not permitted under French law, it is undisputed that MEPA took no step under French procedure for obtaining this discovery at issue prior to the entry of judgment. Now, MEPA seeks to conduct broad gauge, category by category, American-style discovery, citing a French appellate rule allowing additional documents to be submitted for the first time on appeal.

B. *Avoiding Offense to Foreign Tribunals.* We have emphasized that allowing section 1782 petitions to be filed by "any interested person" represents an "effort to liberalize the assistance provided by American courts *to foreign and international tribunals.*" *In re Malev Hungarian Airlines,* 964 F.2d 97, 101 (2d Cir.) (emphasis added), *cert. denied,* —— U.S. ——, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992). The statute should not become an instrument of unilateral advantage as between the parties. It is therefore useful for the district court to inquire into the "nature and attitudes" of the foreign jurisdiction towards discovery. *See Aldunate,* 3 F.3d at 59. It seems undisputed that

---

2. The Senate Report accompanying the 1964 amendments to section 1782 state that

> [Section 1782(a)] leaves the issuance of an appropriate order to the discretion of the court which, in proper cases, *may refuse to issue an order* or may impose conditions it deems desirable. In exercising its discretionary power, the court *may take into account the nature and attitudes of the government of the country from which the request emanates and the character of the proceedings in that country.*

S.Rep. No. 1580, 88th Cong., 2nd Sess. (1964), *reprinted in* 1964 U.S.Code Cong. & Admin.News 3782, 3788 (emphasis added).

3. The district court expressly stated:

> Whether the evidence MEPA seeks would be discoverable in France or not is unknown and irrelevant to me. My decision is based on the determination that granting this petition would be an unwarranted intrusion into France's system of evidence gathering.

*Euromepa,* 155 F.R.D. at 84 n. 2.

the French tolerate only the most circumscribed exchange of information: oral examination of witnesses only by a judge; and disclosure of specified documents rather than exploratory discovery and, even so, only with judicial intervention. The district court's brief review of the nature and attitudes of the French toward discovery bears upon an important discretionary value: whether the discovery sought here aids the proceedings abroad or whether it distorts the adversarial symmetry existing there. In my opinion, we should not "countenance the use of U.S. discovery procedures to evade the limitations placed on domestic pre-trial disclosure by foreign tribunals." *John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132, 136 (3d Cir.1985).

We have previously recognized that one policy consideration underlying section 1782 is "maintaining the balance between litigants that each nation creates within its own judicial system, preventing circumvention of foreign restrictions on discovery and avoiding offense to foreign tribunals." *Aldunate*, 3 F.3d at 60. "Congress intended that these concerns be addressed by a district judge's exercise of discretion." *Id.* Therefore, one important inquiry under *Aldunate* is whether the grant of section 1782 discovery would circumvent the forum's procedures or be an affront to the foreign tribunal.

The majority opinion states: "We do not believe that an extensive examination of foreign law regarding the existence and extent of discovery in the forum country is desirable in order to ascertain the attitudes of foreign nations to outside discovery assistance." In this way, the majority holds that a district court errs by inquiring too extensively into a subject we held to be appropriate and useful in *Aldunate*. With all due respect, I think this offers little guidance to the district court, and in effect displaces the discretion conferred on the district court by statute.

The majority cites Professor Smit's sound view that United States courts should not undertake to achieve a mastery of foreign law subtleties "for the purpose of honoring a simple request for assistance." However, the district court's overview did not place the court in the role of administering French law. And MEPA's petition is no simple request for assistance: MEPA seeks broad gauged discovery against its adversary, conducted entirely in the United States.

Professor Smit's view does not discourage inquiry into the "nature and attitudes" of the foreign forum in order avoid "an affront to foreign tribunals." *Aldunate*, 3 F.3d at 59, 61. The majority opinion chokes off any discretion on this, however, by limiting the district court's inquiry to "authoritative proof that a foreign tribunal would reject evidence obtained with the aid of Section 1782." And any such proof must be "embodied in a forum country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures." This rigid formulation narrows useful discretion and invites friction with the courts of other countries, without avoiding the entanglement of American courts in the subtleties of foreign law: it is no easy task to determine what expressions by foreign courts or governments are "authoritative" and whether they authoritatively dispose of a particular petition for discovery. For example, the courts of France may well approve the discovery of a bill of lading from a nonparty in the United States without intending that the parties to French lawsuits be drawn into the coils of American discovery.

The majority opinion points out that a foreign court can always enjoin a party subject to its jurisdiction from pursuing discovery in the United States, and looks forward to "an on-going dialogue between the adjudicative bodies of the world community". On the whole, I think it may be unwise to stimulate declarations about the American system of discovery by foreign countries and tribunals. In any event, even if such a dialogue elicited categorical statements of position, I do not think that the statutory discretion of the district court should be narrowed on the theory that any resulting impairment of foreign procedures will elicit a corrective order or declaration from abroad.

*C. Permissible Limitations.* I agree with the majority that in many instances the misgivings of a district court in granting a petition under section 1782 can be reconciled by a closely tailored discovery order. (Indeed, this may be the only substantial re-

maining area of discretion under the majority opinion.) The majority invites the district court to consider two provisos, neither of which seems to me practical or useful. The majority recognizes that French procedure discourages examination of documents that a party does not intend to offer in evidence, and that MEPA's document request casts a much broader net. The majority points out that the district court is free to require that all of the evidence gathered by MEPA in the United States be submitted to the French court, whether or not that material assists MEPA's cause. I think it makes little sense to contrive a hybrid Franco–American system by which mass discovery of inadmissible materials gathered under the American model is permitted to go forward on condition that the inadmissible material be submitted in bulk to the French court. In this way, we both interfere with French discovery practice and clog the French appeals court with the random harvest of the American discovery.

The majority offers a second means of mitigating the effects of one-sided American discovery by conditioning the petitioner's discovery in America on an undertaking by the petitioner to furnish a reciprocal exchange of information in the United States. In this way, the entire discovery process is imported to the United States, and the procedures of the foreign forum are completely superseded, at least until such time as the foreign tribunal orders the petitioner to desist.

The majority does not advert to the only procedural device expressly approved by this court that may alleviate the effects of the majority opinion. The majority in *Malev* emphasizes that the district court may require a petitioner under section 1782

> to prepare a discovery plan, make a showing that the discovery is "not obtainable from such other source that is more convenient, less burdensome, or less expensive," such as the [foreign] court, and then require [the petitioner] to take the discovery plan before the [foreign] court for a determination as to which requests are relevant before coming to the United States district court for actual discovery.

*Malev*, 964 F.2d at 102. Given the now narrowed scope of district court discretion in

this circuit, this device may become the best instrument for avoiding the day when United States courts become "global 'Special Masters for Discovery.'" *Id.* at 103 (Feinberg, J., dissenting).