**In re The Application of ISHIHARA CHEMICAL CO., LTD. for an Order to take Discovery of Shipley Company, L.L.C., Pursuant to 28 U.S.C. § 1782.**

### No. 99 MISC. 232(FB).

United States District Court, E.D. New York.

Nov. 16, 2000.

David L. Just, Donald C. Lucas, Lucas & Just, LLP, New York City, for Ishihara Chemical Co., Ltd.

Thomas G. Rowan, Scott D. Jacobson, F. Dominic Cerrito, Pennie & Edmonds LLP, New York City, for Shipley Company, L.L.C.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

Shipley Company, L.L.C. ("Shipley") has moved for vacatur of an order of the Court, dated April 18, 2000, granting the *ex parte* application of Ishihara Chemical Company, Ltd. ("Ishihara") for discovery pursuant to 28 U.S.C. § 1782 (" § 1782"), and to quash or delimit a subpoena issued by Ishihara as a result thereof.[1] The motion requires the Court to resolve a number of issues under that statute, which provides, *inter alia*, that "upon the application of any interested person," the "district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." Principally, the Court is asked to determine (1) whether § 1782 autho-

---

1. Shipley also asserts that Ishihara's *ex parte* application violated Local Civil Rule 6.1(d), because it made no showing why it could not proceed by notice of motion. Discovery requests of the type authorized by § 1782, however, " 'are customarily received and appropriate action taken with respect thereto *ex parte.*' " *In re Letter of Request from the Supreme Court of Hong Kong,* 138 F.R.D. 27, 32 n. 6 (S.D.N.Y.1991) (*"Hong Kong"*) (quoting *In re Letters Rogatory from Tokyo District, Tokyo, Japan,* 539 F.2d 1216, 1219 (9th Cir. 1976) (*"Tokyo Dist."*)); *accord In re Letters Rogatory Issued by Dir. of Inspection of the Gov't of India,* 385 F.2d 1017 (2d Cir.1967) (*"India"*) (Friendly, J.). "[S]uch *ex parte* applications are typically justified by the fact that the parties will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it." *Hong Kong,* 138 F.R.D. at 32 n. 6 (citing *Tokyo Dist.,* 539 F.2d at 1219).

rizes discovery from a party to a foreign proceeding and, if so, (2) whether such discovery may encompass requests for admissions and interrogatories. These questions presuppose that a proceeding before the Japanese Patent Office ("JPO") is a proceeding "in a foreign or international tribunal," an issue also in dispute. There is no circuit court authority explicitly addressing any of these issues.

In opposing discovery, Shipley has enlisted the aid of a preeminent authority on the statute, Hans Smit ("Professor Smit"), the Stanley H. Fuld Professor of Law and Director of the Center for International Arbitration and Litigation at Columbia University. As the Reporter to the United States Commission and Advisory Committee on International Rules of Judicial Procedure, Professor Smit states that he prepared the final versions of various proposed amendments to the statute submitted to Congress during the 1960s, and the explanatory notes accompanying these proposals, which proposals "were adopted by Congress without change." Shipley's Memorandum of Law in Support of its Motion to Vacate the Court's Order Compelling Discovery, Quash the Subpoena, and Deny Discovery ("Shipley Mem. of L.") Ex. C (Declaration of Hans Smit, dated May 18, 2000 ("Smit Decl.")) ¶ 8. According to Professor Smit, the JPO may not be a "foreign tribunal;" in any event, § 1782 does not authorize discovery from a party and, if so, admissions and interrogatories are not permitted.

The Court concludes that (1) the JPO is a foreign tribunal within the intendment of § 1782; (2) discovery under the statute is available from a party to a foreign proceeding, but (3) such discovery does not embrace requests for admissions and interrogatories. The Court refers this matter to a Magistrate Judge to afford the parties a full opportunity to address matters of Japanese law that might assist the Magistrate Judge in determining the scope of deposition and document discovery that may be sought from Shipley by Ishihara.

## BACKGROUND

The following facts are gleaned from the parties' submissions and are not disputed: Ishihara, a Japanese corporation, sells, *inter alia*, products used for tin and tin-alloy electroplating. Shipley, a Delaware corporation, with a place of business in Freeport, New York, is a direct competitor of Ishihara. In or about January 1999, Shipley acquired LeaRonal, Inc., ("LeaRonal"), including nine foreign subsidiaries, and assumed ownership of Japanese Patent Number 2140707 (the "'707 Patent") held by LeaRonal.[2] On July 14, 1999, Ishihara instituted a proceeding against Shipley, presently pending before the JPO, to invalidate the '707 Patent in an effort to avoid royalty payments. Ishihara claims that Shipley offered for sale in Japan electroplating products that are the subject of the '707 Patent (sold in the United States under the name SOLDERON) prior to the filing of Shipley's patent application on September 20, 1985. Ishihara alleges that such offers of sale invalidate the '707 Patent under Japanese law.

In its *ex parte* discovery application and subpoena, Ishihara noticed one deposition, and sought sixty-nine requests to admit, twelve interrogatories and four document requests, three of which were tied to the interrogatories.[3] Ishihara's discovery requests concerned not only the '707 Patent, but also Japanese Patent Number 2807637 (the "'637 Patent"). Subsequently, Ishihara abandoned discovery regarding the '637 Patent because no action had been instituted before the JPO concerning that

2. "Shipley" hereafter collectively refers to Shipley and LeaRonal.

3. One of these document requests called for the production of all documents relied on by Shipley in preparing its responses to the interrogatories; the other two required Shipley to produce all documents referred to in such responses and any advertising or promotional materials used by Shipley in regard to each product identified therein.

patent. Consequently, what remains are Ishihara's discovery requests concerning the '707 Patent.

## DISCUSSION

### I. Overview of the 1964 Amendments to § 1782 and Relevant Second Circuit Precedent.

Section 1782, entitled "Assistance to foreign and international tribunals and to litigants before such tribunals," provides as follows:

(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure. A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

(b) This chapter does not preclude a person within the United States from voluntarily giving his testimony or statement, or producing a document or other thing, for use in a proceeding in a foreign or international tribunal before any person and in any manner acceptable to him.

28 U.S.C. § 1782 (1994 & Supp.1997). In all relevant parts, the current language of the statute mirrors its revision and amendment in 1964.[4]

Before its amendment in 1964, § 1782 provided:

The deposition of any witness within the United States to be used in any judicial proceeding pending in any court in a foreign country with which the United States is at peace may be taken before a person authorized to administer oaths designated by the district court of any district where the witness resides or may be found.

The practice and procedure in taking such depositions shall conform generally to the practice and procedure for taking depositions to be used in courts of the United States.

28 U.S.C. § 1782 (1958).

In *Foden v. Aldunate (In re Aldunate)*, 3 F.3d 54 (2d Cir.1993), the Second Circuit traced the general legislative history of § 1782, noting that "Federal law has provided for some form of judicial assistance to foreign courts since 1855." *Id.* at 57. As explained therein, early statutes were quite narrow in scope, but the evolutionary process "has generally been one of increasingly broad applicability." *Id.* As *Aldunate* further informs, the 1964 amendments were drafted by the United States Commission on International Rules of Judicial Procedure, and (1) expanded the class of litigation within the statute's orbit

---

**4.** The only amendment since 1964 occurred in 1996 when the words "including criminal investigations conducted before formal accusations" were inserted after the phrase "proceeding in a foreign or international tribunal", in § 1782(a). *See* Pub.L. No. 104–106, 110 Stat. 186 § 1342(b) (1996) (codified at 28 U.S.C. § 1782 (Supp.1997)).

from "courts" to "tribunals," including "international tribunals;" (2) permitted "any interested person" to partake of the discovery process, thereby allowing not only foreign tribunals and officials to initiate the process but also private litigants, and (3) deleted a prior requirement that the foreign proceeding actually be pending. *Id.* In respect to the discovery process, the reconstituted statute provided for a person "to give his testimony or statement or to produce a document or other thing," thereby expanding its reach beyond depositions.

These amendments were in keeping with the primary intent of Congress—to "clarif[y] and liberalize [ ] existing U.S. procedures for assisting foreign and international tribunals and litigants in obtaining oral and documentary evidence in the United States." *Id.* (quoting S.Rep. No. 88–1580 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3782, 3788) ("Senate Report").[5] Congress' underlying rationale for the amendments were the " 'twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.' " *Id.* at 58 (quoting *Malev Hungarian Airlines v. United Techs. Int'l Inc. (In re Malev Hungarian Airlines)*, 964 F.2d 97, 100 (2d Cir.), *cert. denied*, 506 U.S. 861, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992)).

Given the broad reach of the 1964 amendments, the discrete holding of the court in *Aldunate* was that the material requested in the district court need not be discoverable under foreign law.[6] Stating that it was "not free to read extra-statutory barriers to discovery into section 1782," *id.* at 59, the court noted that the statute "makes no reference whatsoever to a requirement of discoverability under the laws of the foreign jurisdiction." *Id.* Moreover, it determined that "a literal reading of the unambiguous language of section 1782 comports with the purpose and legislative history of the statute" because "[i]t was deliberately drawn" in order " 'to grant[ ] wide assistance to others, but demand[ ] nothing in return.' " *Id.* (quoting *Malev*, 964 F.2d at 101).[7]

Although the court in *Aldunate* determined that discoverability under the laws of the foreign jurisdiction was not a threshold requirement, it counseled that the 1964 amendments invested the district courts "with wide discretion in granting relief under section 1782," *id.*, and therefore "district judges may well find that in appropriate cases a determination of discoverability under the laws of the foreign jurisdiction is a useful tool in their exercise of discretion under section 1782." *Id.* at 60. The court drew from the Senate Report in explaining the breadth of the district court's discretion:

> [Section 1782(a) ] leaves the issuance of an appropriate order to the discretion

---

5. Page references to the Senate Report are to the version reprinted in *United States Code Congressional & Administrative News*. The House of Representatives also produced a report, *see* H.R.Rep. No. 88–1052 (1963). Its text, however, appears to mirror nearly verbatim—and certainly reflects in all relevant respects—the language of the Senate Report cited herein.

6. In so holding, the court acknowledged that it disagreed with contrary holdings by the First and Eleventh Circuits explicitly reading a foreign discoverability requirement into § 1782. *See Aldunate*, 3 F.3d at 60 (disagreeing with *In re Asta Medica, S.A.*, 981 F.2d 1 (1st Cir.1992); *In re Ministry of Legal Affairs of Trinidad & Tobago*, 848 F.2d 1151 (11th

Cir.1988), *cert. denied sub nom. Azar v. Minister of Legal Affairs of Trinidad & Tobago*, 488 U.S. 1005, 109 S.Ct. 784, 102 L.Ed.2d 776 (1989)).

7. In a similar vein, it undoubtedly also need not be established that the discovered material be admissible as evidence in the foreign proceeding. *See Aldunate*, 3 F.3d at 60 (referencing the Third Circuit's decision in *John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132, 135–36 (3d Cir.1985) for the proposition "that section 1782 does not require (1) that the foreign courts have similar judicial assistance procedures, or (2) that the evidence sought be admissible under the rules of evidence of the foreign jurisdiction").

of the court which, in proper cases, may refuse to issue an order or may impose conditions it deems desirable. In exercising its discretionary power, the court may take into account the nature and attitudes of the government of the country from which the request emanates and the character of the proceedings in that country, or in the case of proceedings before an international tribunal, the nature of the tribunal and the character of the proceedings before it.

*Id.* at 59 (quoting Senate Report at 3788).

Analyzing the district court's discovery order in the context of the discretion vested in district courts under § 1782, the Second Circuit in *Aldunate* determined that the district court did not abuse its discretion because, even though the court did not make a finding as to the parties' ability to obtain pre-trial discovery under Chilean law, it was nonetheless "properly guided" by the "twin aims" of the statute—"especially that of encouraging international cooperation"—by inquiring into "whether its grant of discovery under section 1782 would circumvent Chilean restrictions on discovery and whether its grant of discovery would be an affront to the Chilean court or Chilean sovereignty." *Id.* at 61–62.

In contrast to *Aldunate*, the court in *Metallgesellschaft AG v. Hodapp (In re Metallgesellschaft AG)*, 121 F.3d 77 (2d Cir.1997), held that the district court abused its discretion by denying discovery on the ground that the sought-after evidence would not be discoverable under German law. Reinforcing its view "that district courts must exercise their discretion under § 1782 in light of the twin aims of the statute," the court concluded that "[i]n stating its views, the district court did not advert to these objectives, explicitly or implicitly, and in fact the reasons the court did give were at odds with these goals." *Metallgesellschaft*, 121 F.3d at 79. As explained by the court, "the district court considered discoverability under foreign law as more than merely, as [*Aldu-*

*nate* ] indicated, a 'useful tool': it was the beginning and end of the inquiry. As we declared in [*Aldunate* ], foreign discoverability cannot be used, consistent with the language and purpose of § 1782, as such a blunt instrument." *Id.* at 79–80 (internal quotation and citation omitted).

Nevertheless, the circuit court "has expressed some concern over conflicts with foreign jurisdictions that could be engendered by § 1782," holding that " '[a] grant of discovery that trenched on the clearly established procedures of a foreign tribunal would not be within section 1782.' " *Esses v. Hanania (In re Esses)*, 101 F.3d 873, 876 (2d Cir.1996) (citing *Euromepa S.A. v. R. Esmerian, Inc. (In re Euromepa, S.A.)*, 51 F.3d 1095, 1099 (2d Cir.1995) ("*Euromepa I* ")). It has cautioned, however, "against speculative forays into legal territories unfamiliar to federal judges," *id.* (internal quotation omitted), because such forays "would result in an unduly expensive and time-consuming fight about foreign law," *Metallgesellschaft*, 121 F.3d at 80 (internal citations and quotations omitted), thereby "undermining the twin aims of the statute." *Id.; see also Euromepa, S.A. v. R. Esmerian, Inc. (In re Euromepa, S.A.)*, 154 F.3d 24, 28 (2d Cir. 1998) ("*Euromepa II* ") ("[i]n the exercise of its discretion, the district court should not attempt to conduct a detailed analysis of foreign law, but should focus primarily on fostering these twin aims"). Consequently, "only upon authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782, should a district court refrain from granting the assistance offered by the act." *Esses*, 101 F.3d at 876 (citation and quotations omitted); *see also Metallgesellschaft*, 121 F.3d at 80 (same). In the absence of such authoritative proof, " 'it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply deny-

ing relief outright.'" *Id.* (quoting *Euromepa I*, 51 F.3d at 1101).

Turning to that aspect of the 1964 amendments substituting "tribunals" and "international tribunals" for "courts," its liberalizing purpose was to broaden the statute's reach beyond proceedings before conventional foreign courts to encompass " 'proceedings before a foreign administrative tribunal or quasi-judicial agency.'" *Fonseca v. Blumenthal*, 620 F.2d 322, 323 (2d Cir.1980) (quoting Senate Report at 3788). The statute was intended, however, to apply only to "governmental entities, such as administrative or investigative courts, acting as state instrumentalities or with the authority of the state," and not to private dispute resolution bodies. *National Broad. Co. v. Bear Stearns & Co.*, 165 F.3d 184, 189 (2d Cir.1999). Moreover, the Second Circuit has instructed that a foreign body is not a "tribunal" if it has an institutional interest in reaching a certain outcome, that is, if the body acts unlike a neutral arbiter. *See Euromepa II*, 154 F.3d at 27; *India*, 385 F.2d at 1019–20. In that regard, in *India*, Judge Friendly counseled that "one useful guideline is the absence of any degree of separation between the prosecutorial and adjudicative functions." *India*, 385 F.2d at 1021. In all circumstances, the "hallmark of a tribunal" is that it exists to provide "impartial adjudication." *Fonseca*, 620 F.2d at 324.

Within this framework, the Second Circuit has held that a proceeding by an Indian Income–Tax Officer to assess taxes was not a proceeding before a tribunal, *India*, 385 F.2d at 1021 ("a tax assessor scarcely fits the notion that most American legislators would entertain of what constitutes a 'tribunal' "); Columbia's Superintendent of Exchange Control, acting in the government's interest to enforce its laws and as its legal representative, was not a tribunal, *Fonseca*, 620 F.2d at 324; a French bankruptcy proceeding, adjudicating no claim but merely enforcing a judgment, was not a proceeding, *Euromepa II*, 154 F.3d at 28; and an arbitral panel

established by private parties was not a tribunal, *National Broad.*, 165 F.3d at 191. In contrast, a Chilean competency proceeding, *Aldunate*, 3 F.3d at 62, and an Italian bankruptcy proceeding adjudicating claims, *Lancaster Factoring Co. v. Mangone (In re Lancaster Factoring Co.)*, 90 F.3d 38, 41–42 (2d Cir.1996), have been deemed to constitute proceedings before tribunals because they were truly adjudicative in nature. *See also Euromepa II*, 154 F.3d at 27 (reviewing cases).

Given the nature of § 1782, the rationale underlying the 1964 amendments, and the application of the statute by the Second Circuit in resolving discovery disputes, the Court turns to the discrete issues presented in this litigation.

## II. Is the Japanese Patent Office a foreign tribunal?

The parties do not dispute that Ishihara has initiated an invalidity proceeding against Shipley in the JPO concerning the '707 Patent, and that the proceeding currently is pending before that foreign body. Shipley contends, however, that Ishihara has the burden of establishing that the JPO is a "tribunal" as contemplated by the statute, and that it has failed to sustain its burden because it has not shown that the JPO is "performing an adjudicatory function without an 'institutional interest in a particular result.'" Shipley Mem. of L. at 7 (quoting *India*, 385 F.2d at 1020). It claims in that respect that Ishihara has not provided any "factual support concerning the nature of the Japanese invalidity proceeding," relying only on "an unsupported legal argument based on its United States attorneys' understanding of that proceeding." *Id.* at 8.

Be this as it may, Shipley has also chosen not to educate the Court as to the nature of an invalidity proceeding before the JPO, submitting only a cryptic declaration from a licensed Japanese attorney opining that pre-trial discovery does not exist for an invalidity proceeding in the

JPO. Shipley Mem. of L. Ex. D (Declaration of Naoki Matsumoto, dated May 18, 2000) ¶ 5. This declaration contends that the JPO "may only issue an order to call a witness to testify before it during the proceeding." *Id.* Shipley also relies on a part of Professor Smit's declaration that the Second Circuit, as reflected by its decisions in *India* and *National Broadcasting*, requires more than the exercise of adjudicatory authority in that its rulings "are premised on a concern that the district courts not be burdened with providing assistance to other than judicial proceedings similar to their own." Smit Decl. ¶ 21. Consequently, Professor Smit reasons that "[t]he Second Circuit is most likely to regard it as improper to provide assistance to a foreign Patent Office that it does not provide to its United States counterpart." *Id.* Taking issue with Professor Smit, Ishihara asserts that "[t]he U.S.Patent and Trademark Office does not act in an adjudicatory function; the Japanese Patent Office during an invalidity trial does, since it is acting as a neutral arbiter and as such is a 'tribunal' within the meaning of the statute." Ishihara Mem. of L. at 5.

Preliminarily, Professor Smit's limited reading of *India* and *National Broadcasting* does not appear to be well founded. Nothing in either of these cases suggests the concept of parallelism that he postulates. The juxtaposition of the Internal Revenue Service ("IRS") to the Indian Tax Office in *India* was simply designed to drive home the point that since the Indian Tax Office served the same non-adversarial tax collection functions as the IRS, it did not have the trappings of an adjudicatory, governmental tribunal. In *National Broadcasting,* the court simply ruled that the statute did not embrace private, nongovernmental bodies.

Federal Rule of Civil Procedure 44.1 provides:

> A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Fed.R.Civ.P. 44.1; *see Carlisle Ventures, Inc. v. Banco Español de Crédito, S.A.,* 176 F.3d 601, 604 (2d Cir.1999) (in interpreting foreign law a court "may consider any relevant material or source" and its "determination . . . is treated as a question of law").

The first sentence of Rule 44.1 indicates that the party invoking foreign law bears at least the modest burden of notifying an opposing party and the court that foreign law will be at issue. The second sentence of the rule, however, indicates that, beyond mere notice, failure to supply the court with an adequate presentation of foreign law may not be fatal to a party's argument, since it empowers the court to conduct its own research. *See, e.g., Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998) ("we manifest[ ] our agreement with the concept that appellate courts, as well as trial courts, may find and apply foreign law"). This provision of the rule evolved, no doubt, because "[a]ll too often counsel will do an inadequate job of researching and presenting foreign law or will attempt to prove it in such a partisan fashion that the court is obliged to go beyond their offerings." 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2444, at 648 (2d ed.1995). Thus, in *Curley,* the Second Circuit expressly held that a district court "need not . . . avoid[ ] a full analysis" of foreign law "simply on the basis of an inadequate submission by one party." *Curley,* 153 F.3d at 13.

In its search for the law, the court in *Curley* "urge[d] district courts to invoke the flexible provisions of Rule 44.1." *Id.* Because "any relevant source" may be considered under the rule, the Second Circuit has noted that this would include "affida-

vits submitted by the parties." *Euromepa II*, 154 F.3d at 28 n. 2. The court cautioned, however, in *Euromepa II*, to be circumspect about allegations espousing foreign law since "[q]uestions of foreign law are nonetheless questions of law, and not of fact." *Id.* The conventional notions of burden of proof, therefore, are anathema to the underlying purpose of Rule 44.1—to assist the court in its search for foreign law. Consequently, the Court views Rule 44.1 as placing a collective responsibility on the parties to render such assistance.

It would intuitively appear that a proceeding challenging the validity of a patent before a foreign body would qualify as a proceeding before a foreign tribunal. However, neither party has discharged its Rule 44.1 obligation to render effective assistance to the Court in making the requisite legal determination. The conclusory allegations of the parties in their declarations and memoranda are insufficient. Moreover, passing references to articles of the Japanese Patent Law, without English translations, are of no practical use to the Court, whose knowledge of the Japanese language is regrettably limited to "*sayonara.*" Under these circumstances, the Court could order a hearing to determine the status and function of the JPO in the context of an invalidation proceeding. *See, e.g., Fonseca,* 620 F.2d at 323 (noting district court held an "evidentiary hearing ... to determine the status and function of the Superintendent of Exchange Control under Columbian law"). However, further proceedings are not necessary because the Court's independent research of English-language texts examining the JPO and its activities satisfies the Court that the JPO is acting as a tribunal within the intendment of § 1782 when it conducts an invalidation proceeding.

For example, Peter D. Rosenberg, author of an influential patent law treatise, has noted the trial-type character of invalidity proceedings before the JPO: "In Japan the issues of validity and infringement are tried before different tribunals, the former within the Japanese Patent Office, the later by a court having general civil jurisdiction within the geographic district wherein the infringement was alleged to have occurred. A separate proceeding may be instituted by the patentee in the Japanese Patent Office to alter the scope of the claims." 3 Peter D. Rosenberg, *Patent Law Fundamentals* § 19.03(2) (2d ed. 1980 & Supp.2000). Another observer of international patent issues, Todd F. Volyn, writing in a leading journal devoted to law and technology issues, also has stressed the judicial character of JPO functions and their resemblance to tasks assigned to courts of law in the United States:

> The *Tokkyocho,* or Japanese Patent Office established as an extra-ministerial agency of the Ministry of International Trade and Industry (MITI), handles many of the ordinary functions found in the U.S.Patent Office such as the examination of patent applications. However, it also has some unique functions. It provides an interpretation of the scope of patent claims, something reserved solely for courts ... in the United States. Further, it is tasked with conducting compulsory license arbitration and encouragement of inventive activities.

Todd F. Volyn, *Agreement Consummation in International Technology Transfers,* 33 IDEA 241, 283 (1993) (internal quotation omitted). As an eminent practitioner recently noted in an American Bar Association publication, current JPO developments appear to place even greater emphasis on the JPO's adjudicatory role:

> The JPO has ... initiated an expedited tribunal for appeal examination and trial in order to complete a trial for invalidation more quickly. Under the new practice, the JPO appeal examiners are sent to the provincial areas to carry out the oral proceedings and examination of witnesses by the parties concerned. Previously, these were only

available in Tokyo. The JPO is also providing information on invalidation, trial decisions and opposition-related decisions on the Internet.

Samson Helfgott, *U.S. Bar/JPO Liaison Council Meeting*, 17 No. 2 Intell.Prop.L.Newsl. 20, 20 (2000). The Court's research clearly indicates, therefore, that a proceeding before the JPO seeking to invalidate a patent is an adversarial proceeding and that the JPO is a neutral adjudicator of the parties' dispute. The JPO is consequently a tribunal within the meaning of § 1782.

### III. Does § 1782 authorize discovery from a party to the foreign proceeding?

The Second Circuit has assumed, without deciding, that § 1782 authorizes discovery from a party to a foreign proceeding. *See, e.g., Metallgesellschaft*, 121 F.3d 77 (reversing order denying discovery from party to breach of employment contract action in German Labor Court); *Esses*, 101 F.3d 873 (affirming grant of discovery from party to proceeding to determine administrator of estate in Hong Kong court); *Malev*, 964 F.2d 97 (reversing order denying discovery from party to action for specific performance of aircraft contract in Hungarian Municipal Court).

Professor Smit, whose scholarship the Second Circuit has accredited, *see, e.g., Metallgesellschaft*, 121 F.3d at 80 (quoting from Hans Smit, *Recent Developments in International Litigation*, 35 S.Tex.L.Rev. 215, 235 (1994)), opines that "[t]he purpose of Section 1782 is to provide American judicial assistance in procuring evidence in the United States from a third party, not from a party, in the foreign proceedings," reasoning that "assistance is needed only if the person who is to produce the evidence is not subject to the jurisdiction of the foreign or international tribunal." Smit Decl. ¶ 14. He bolsters this contention by noting that the statute "does not mention 'admissions' or 'interrogatories,' which, under the Federal Rules, can be obtained

only from parties." *Id.* ¶ 24. Consequently, he argues, "if Section 1782 were intended to allow discovery from parties to a foreign proceeding, it would no doubt have expressly included admission requests and interrogatories." *Id.* Moreover, Professor Smit rails against the risk of exposing an American defendant to greater discovery under § 1782 than its foreign opponent might be subject to under foreign law. *See id.* ¶ 16

■ Professor Smit's arguments have logical appeal, and the hazards of an unbalanced discovery equation are well worth noting. Nonetheless, neither the plain language of the statute nor its legislative history speak to any distinction between a third party and party litigant. To the contrary, the statute plainly brings within its reach all "person[s]" residing or found in the district. Where, as here, the statute does not define the operative word, "it is to be given its ordinary or natural meaning." *National Broad.*, 165 F.3d at 188. Thus, "[i]f the statutory terms are unambiguous, [judicial] review generally ends and the statute is construed according to the plain meaning of its words." *Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363, 371 (2d Cir.1999) (quotation and citation omitted). "Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous." *Id.* (citation omitted).

■ In ascertaining the ordinary meaning of a word, resort may be had to its dictionary definition. *See, e.g., United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 90 (2d Cir.1999); *United States v. Martinez–Santos*, 184 F.3d 196, 204 (2d Cir.1999). Amongst the definitions that *Webster's* ascribes to the word "person," is "a human being or organization with legal rights and duties." *Webster's II New Riverside University Dictionary* 877 (1988); *see also Black's Law Dictionary* 1142–43 (6th ed.1990) (recognizing that corporations and governmental units may be "persons"). This definition squares with Congress' rule of construction that, "unless the

context indicates otherwise," whenever the word "person" appears in "any Act of Congress" it "include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1; *see Jews for Jesus, Inc. v. Jewish Community Relations Council of N.Y, Inc.,* 968 F.2d 286, 293–94 (2d Cir.1992) (example where context of statute requires "person" to mean only an individual).

■ Nothing in the context of § 1782 suggests that the word "person" should be construed outside of its ordinary meaning. To the contrary, the common expansive meaning of "person" comports with the statute's twin aims of making the federal courts available for efficient means of assistance to participants in international litigation and, by such example, encouraging foreign countries to reciprocate. Allowing a party to be deposed where it resides or can be found, and where documents presumably would be more readily accessible and discoverable, certainly squares with the notion of lending efficient assistance to international litigants. In a similar vein, access to judicial overview on the veritable spot provides for the ready resolution of any discovery disputes which may surface. The Court cannot, therefore, read an extra-statutory barrier to discovery into § 1782 by limiting discovery to third parties. Had Congress intended the word "person" to be so circumscribed, it could readily have so provided.

Furthermore, although Professor Smit states that he was the drafter of the amendments to the statute and accompanying explanatory notes, he has not submitted any such notes in support of his restrictive discovery contention; nor has the Court's research discerned any legislative history on that subject. One would think that someone in Professor Smit's role would have left some official paper trail addressing such an important qualification to the word "person." Nor has the Court discerned any pre- or post-amendment writings supportive of Professor

Smit's suggested qualification in any of his numerous professional publications.

Notably, in *General Universal Trading Corp. v. Morgan Guar. Trust Co. (In re International Judicial Assistance (Letter Rogatory) for the Federative Republic of Brazil),* 936 F.2d 702, 706 (2d Cir.1991) *("Brazil"),* the Second Circuit, accepting the Government's identification of Professor Smit "as the chief draftsman of the 1964 amendments," *id.* at 706, nonetheless rejected his contention in a Columbia Law Review article that the deletion of the pre-amendment provision that the foreign proceeding be "pending" was intended to mean "only that the evidence is eventually to be used in such a proceeding." *Id.* (quoting Hans Smit, *International Litigation Under the United States Code,* 65 Colum.L.Rev. 1015, 1026 (1965)). In words equally applicable here, the court presciently observed: "[W]e would expect to see at least some hint of that thought in the authoritative reports issued by members of the Senate and House committees. Staff members have ample opportunity to draft language that members of Congress may choose to use in committee reports and statutory texts, but they may not elucidate congressional intent by bearing witness to congressional thinking." *Id.* Accordingly, although the Court in *Brazil* recognized that "Professor Smit was undoubtedly in a good position to know what the congressional committees had in mind," it did not believe it appropriate to accept his commentary "as persuasive evidence of the meaning of the statute that the Congress ultimately enacted." *Id. See also National Broad.,* 165 F.3d at 190 n. 6 (finding Professor Smit's contention that § 1782 should be read to encompass private as well as governmental arbitration to be "unpersuasive" in the absence of any definitive knowledge of legislative intent). In a similar vein, Professor Smit's Declaration in the present case cannot compromise the clear inclusive language of the

statute.[8]

## IV. Does § 1782 authorize requests for admissions and interrogatories?

Although § 1782 authorizes the district court to require a person "to give his testimony *or* statement" (emphasis added), it makes no mention as to what Congress intended by including a "statement" within the ambit of discovery, or the precise mechanism for obtaining a "statement" from a person. Although in *Aldunate* the Second Circuit alluded to language in the Senate Report that the amendments to § 1782 were intended to assist in obtaining "oral and documentary evidence," *Aldunate*, 3 F.3d at 57, this would appear to be a general rather than a particularized view of the statute since it is a cardinal rule of statutory construction that "[s]tatutes must be interpreted, if possible, to give each word some operative effect." *Walters v. Metropolitan Educ. Enters., Inc.*, 519 U.S. 202, 209, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997). This is especially so when words are separated by "or" since "[c]anons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 229, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)); *see also National Broad.*, 165 F.3d at 190,

n. 7 (citing *Anderson v. Conboy*, 156 F.3d 167, 179 (2d Cir.1998), for the proposition that references in legislative history to but one category "could not overcome statutory language clearly encompassing both categories").

"Statement" under § 1782 therefore is not to be viewed as interchangeable with "testimony." This conclusion is not only consistent with the canons of statutory construction, but is reinforced by the internal construct of the statute, which also employs the disjunctive in providing for the production of documents or other things. Indeed, the Senate Report reinforces the fact that "testimony", "statements," "documents" and "other things" each constitute separate means for rendering assistance in a proceeding in a foreign or international tribunal. As stated therein, "[s]ubsection (a) of proposed revised section 1782 makes clear that U.S. judicial assistance may be sought not only to compel testimony *and* statements but also to require the production of documents *and* other tangible evidence." Senate Report at 3788 (emphasis added).[9]

In a general sense, a "statement" is simply "a declaration of matters of fact." *Black's Law Dictionary* at 1408. Responses to interrogatories and requests for admissions obviously are statements. It does not necessarily follow, however, that such statements can be judicially compelled under § 1782. Given such uncertainty, it strikes the Court that, as in

**8.** Curiously, Professor Smit's Declaration, in placing a restrictive interpretation on the word "person," is markedly inconsistent with his professional publications, which uniformly espouse the liberal application of § 1782. *See National Broad.*, 165 F.3d at 190 n. 6; *Metallgesellschaft*, 121 F.3d at 80; *Brazil*, 936 F.2d at 706. In fact, every aspect of Professor Smit's Declaration supports each of Shipley's arguments for the narrow application of the statute, giving pause to the Court in this case in crediting his expertise.

**9.** The Senate Report in respect to subsection (a) reads, in pertinent part, as follows:

The proposed revision of section 1782, set forth in section 9(a) clarifies and liberalizes

existing U.S. procedures for assisting foreign and international tribunals and litigants in obtaining oral and documentary evidence in the Unites States and adjusts those procedures to the requirements of foreign practice and procedure.

Subsection (a) of proposed revised section 1782 makes clear that U.S. judicial assistance may be sought not only to compel testimony and statements but also to require the production of documents and other tangible evidence. It thus recognized that the need for obtaining tangible evidence may be as imperative as the need for obtaining oral evidence. Senate Report at 3788.

*National Broadcasting,* "legislative history and other tools of interpretation may be employed to determine legislative purpose more perfectly." 165 F.3d at 188 (quoting *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation,* 17 F.3d 521, 531 (2d Cir.1994)).

The 1964 amendments mark the advent of the word "statement" in § 1782, and it appears in both of its subsections. Although the Senate Report offers no explanation as to its meaning or reach in commenting on subsection (a), referencing only the liberalizing impact of the amendments on "oral," "documentary" and "other tangible evidence," it explains the purpose of subsection (b) as follows:

> Subsection (b) of proposed revised section 1782 reaffirms the pre-existing freedom of persons within the Unites States voluntarily to give testimony or statements or produce tangible evidence in connection with foreign or international proceedings or investigations. This explicit reaffirmation is considered desirable to stress in the relations with foreign countries the large degree of freedom existing in this area in the United States. It also serves to make clear that subsection (a) leaves that freedom unaffected.

Senate Report at 3790.

Thus, subsection (b) encourages the voluntary cooperation of those with information relevant to "foreign or international proceedings or investigations." One need only think of the inestimable value to law enforcement authorities of those who voluntarily report criminal wrongdoing. Subsection (b) sheds little light, however, as to the reach and purpose of compelled statements under subsection (a). The only explanation uncovered by the Court was given by Professor Smit in his oft-cited 1965 Columbia Law Review article:

> Under new Section 1782, the district court may order the taking of both testimony and statements. Under the laws of many foreign countries, parties may not be heard as witnesses and party statements are not considered testimony. By specifically referring to statements, Section 1782 makes clear that the district court may order that parties and other persons, whose statements do not qualify as testimony under foreign practice, may be heard.

Smit, 65 Colum.L.Rev. at 1026 (internal citation omitted).

Professor Smit's understanding of the purport of subsection (a) is hardly a model of clarity and offers little assistance to the Court in deciding whether it may require a party to a foreign proceeding to respond to interrogatories or requests for admissions. Nevertheless, the Court is satisfied that neither of these discovery devices falls under the umbrella of the statute.

Initially, a more particularized view of the predecessor statutes is a useful point of departure. In enacting the first foreign judicial assistance statute in 1855, Congress merely authorized circuit courts upon receipt of letters rogatory "from any court of a foreign country" to designate a United States commissioner to conduct the examination of the witnesses, and empowered the commissioner "to compel the witnesses to appear and depose in the same manner as to appear and testify in court." 10 Stat. 630, ch. 140 § 2 (Mar. 2, 1855). Congress next spoke on the subject in 1863, passing a statute entitled "An Act to facilitate the taking of Depositions within the United States, to be used in the Courts of other Countries, and for other Purposes." 12 Stat. 769, ch. 95 (Mar. 3, 1863). It provided, in pertinent part:

> [T]he testimony of any witness residing within the United States, to be used in any suit for the recovery of money or property depending in any court in any foreign country with which the United States are at peace, and in which the government of such foreign country shall be a party, or shall have an interest, may be obtained, to be used in such suit.... [T]he district judge of any district where said witness resides or shall

be found ... shall issue a summons to such witness requiring him to appear before the officer or commissioner named in such commission or letters rogatory, to testify in such suit.

Such remained the status of judicial assistance provided by Congress in the United States in aid of litigation in foreign courts until 1948 when § 1782, as amended the following year, eliminated the restrictive nature of the statute to suits for money or property involving a foreign country, and opened the deposition process for use "in any judicial proceeding" in a foreign court. Pub.L. No. 80–773, 62 Stat. 869, 949 (1948), *as amended by* Pub.L. No. 81–72, 63 Stat. 89, 103 (1949) (codified at 28 U.S.C. § 1782 (1958)). It thus "eliminated the requirement that the foreign government be a party or have an interest in the case," Steven M. Saraisky, Comment, *How to Construe Section 1782: A Textual Prescription to Restore the Judge's Discretion,* 61 U.Chi.L.Rev. 1127, 1131 (1994), but stopped short of expressly permitting individual litigants to request depositions. The 1948–49 revisions provided that depositions "may be taken before a person authorized to administer oaths designated by the district court," and further provided that "[t]he practice and procedure in taking such depositions shall conform generally to the practice and procedure for taking depositions to be used in courts in the United States." In doing so, Congress believed that "[t]he ample safeguards of the Federal Rules of Civil Procedure, rules 26–32, [would] prevent misuse of this section." H.R.Rep. No. 80–308, at A153 (1947).

No further changes were made to § 1782 until the 1964 amendments, which also repealed and incorporated two acts providing judicial assistance to international tribunals. In doing so, Congress broadened the evidence-gathering process to make document discovery, which previously had been limited to proceedings before international tribunals, applicable in all foreign judicial proceedings.

In 1930 Congress had authorized international tribunals "to require by subpoena the attendance and the testimony of witnesses and the production of documentary evidence relating to any matter pending before it." 46 Stat. 1005, 1006 (1930) (codified at 22 U.S.C. §§ 270–70c (1958)). Shortly thereafter, Congress conferred broad powers upon agents of the United States in matters before any international tribunal or commission in which the United States participated as a party in its own behalf or on behalf of any of its nationals. 48 Stat. 117 (1933) (codified at 22 U.S.C. §§ 270d–70g (1958)). It provided that such agents could "obtain testimony or the production of books and papers by witnesses" by applying to the district court "for the issuance of subpoenas to require" the attendance of witnesses and "the production of books and papers" before the district court. As stated therein:

> The hearing of witnesses and taking of their testimony and the production of books and papers pursuant to such subpoenas shall be before the United States district court for that district or before a commissioner or referee appointed by it for the taking of such testimony, and the examination may be oral or upon written interrogatories.[10]

*Id.*

■ It can readily be gleaned from the legislative history leading to the 1964 amendments that the discovery processes in respect to proceedings in both foreign courts and international tribunals always

---

**10.** Federal Rule of Civil Procedure 31 then used the phrase "Depositions Upon Written Interrogatories" as the alternate means of taking one's testimony. In 1970 the phrase was changed to "Depositions Upon Written Questions." *See* Fed.R.Civ.P. 31, advisory comm. note, 1970 Amend. As explained in the advisory committee notes: "Confusion is created by the use of the same terminology to describe both the taking of a deposition upon "written interrogatories" pursuant to this rule and the serving of "written interrogatories" upon parties pursuant to Rule 33." *Id.*

provided for the taking of depositions, requiring the administration of an oath. The 1964 amendments, although embracing "statements," and opening the discovery process to "any interested person," preserved the concept of the administration of an oath, specifically providing that the district court's order "may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court," who shall have the power "to administer any necessary oath and take the testimony or statement." By contemplating that both testimony and statements would be taken under oath, Congress undoubtedly did not have interrogatories and requests for admissions in mind. It is more plausible to conclude that Congress was simply recognizing that there might be occasions when judicial assistance may best be provided under § 1782 by requiring a witness to render a statement under oath without notice and exposure to the adversarial deposition process, even though the statement may not later be used as deposition testimony. *See Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1052 (7th Cir. 1998) (recognizing that statements under oath need not comply with notice provisions applicable to depositions).

For example, the 1964 amendments added "criminal investigations" to the discovery mix, and the district court is thereby empowered to aid in investigations by foreign prosecutors by requiring those within the district who have knowledge of criminal acts to disclose such knowledge. *See In re Letter Rogatory from the Justice Court, District of Montreal, Canada*, 523 F.2d 562, 565 (6th Cir.1975) (holding, in regard to documentary evidence, "that Congress clearly intended for the provision to extend this nation's assistance to the criminal processes of a foreign country"). The taking of deposition testimony in such circumstances, with its consequent notice to an adversary and an opportunity to be present, may not pragmatically be indicated. Indeed, "in cases involving criminal investigations or prosecutions, civil discovery procedures simply do not apply." Saraisky, 61 U.Chi.L.Rev. at 1142. The Court need not here reflect upon other circumstances that may also warrant a court ordered statement in lieu of a deposition. Suffice it to say that if Congress wanted to authorize the district court in the exercise of its discretion to place the full panoply of United States discovery devices at the disposal of those seeking judicial assistance in aid of foreign litigation, it could have so provided.

The Court acknowledges, however, that the part of the statute providing that, unless otherwise ordered, "the testimony or statement shall be taken . . . in accordance with the Federal Rules of Civil Procedure," has given it some pause since there is no federal rule governing the taking, in contrast to the discoverability, of a statement outside of the context of Rule 33. Obviously this has contributed to the ambiguous nature of the statute. It may well be that the reference to "statement" in that context was simply an inadvertent carryover from the predecessor statute incorporating the Federal Rules in the *implementation* of *permissible* discovery. *Bayer AG v. Betachem, Inc. (In re Bayer AG)*, 173 F.3d 188 (3d Cir.1999), on which Shipley relies, is not to the contrary. There, although stating that "under the terms of the statute, the discovery process is generally guided by the Federal Rules of Civil Procedure," *id.* at 191, the court was simply faced with a discovery dispute involving documents, and utilized the Rules in resolving the dispute. Surely, they can be resorted to for such purpose. This hardly means, however, that § 1782 authorizes interrogatories and admissions.

To the contrary, the Federal Rules of Civil Procedure provide additional support for the Court's conclusion since interrogatories can only be directed to party litigants, *see* Fed.R.Civ.P. 33, while all persons, be they parties or non-parties, are not only subject to being deposed, but may also be required to produce "documents or

tangible things" in their possession. Fed. R.Civ.P. 45(a)(1)(C). Thus, "the non-party witness is subject to the same scope of discovery under [Rule 45] as that person would be as a party to whom a request is addressed pursuant to Rule 34." 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2209 (2d ed.1994) (citation omitted) ("Wright, Miller & Marcus"). This exposure of non-party witnesses to document discovery was in place at the time of the 1964 amendments to § 1782. *See* Fed.R.Civ.P. 45, advisory comm. notes, 1937 adoption, 1946 amend., 1948 amend.[11] Congress knew therefore at that time that nonparty witnesses could be deposed and could be subpoenaed to produce "documents and other tangible things," but could not be required to respond to interrogatories. If interrogatories were contemplated under the 1964 amendments, then all "persons" would be subject to interrogatories since the statute does not prescind between parties and non-parties. Congress could hardly have intended to subject its citizens to broader discovery demands in foreign litigation than in domestic litigation. "Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982).

Moreover, although the principal design of § 1782 is to assist foreign and international tribunals and litigants in "obtaining oral and documentary evidence," Senate Report at 3788, interrogatories and requests for admissions conceptually serve a different purpose. Interrogatories are "not intended as a means to obtain information for the personal use of litigants." 8A Wright, Miller & Marcus § 2162. They are "intended to enable a party to prepare for trial, to narrow the issues and thus help determine what evidence will be needed at the trial, and to reduce the possibility of surprise at the trial." *Id.* Requests for admissions are calculated to "define and limit the matters in controversy between the parties." *Id.* § 2252 (citing Ted Finman, *The Request for Admission in Federal Civil Procedure,* 71 Yale L.J. 371, 376 (1962)). Given the primary evidence-gathering purpose of the statute and the separate functions that interrogatories and admissions serve in the discovery process, it can hardly be presumed that their omission in both the Senate Report and the language of the statute was inadvertent and unintended. *See Elliott Assocs.,* 194 F.3d at 371 ("[w]here the language is ambiguous, we focus upon the broader context and the primary purpose of the statute" (quotation omitted)).

This is not to suggest that interrogatories and requests for admissions are not significant litigation tools. As for interrogatories, when properly employed they "are a simple mode of obtaining the names and addresses of persons having knowledge of pertinent facts, or of securing information about the existence of documentary evidence." 8A Wright, Miller & Marcus § 2163. However, every practitioner knows that they are all too frequently not properly employed and are often unnecessarily burdensome. "Particularly in this era of word processors, interrogatories can readily be misused or employed in such a rote manner as almost to ensure unhelpful answers." *Id.* In any event, the Court cannot "rewrite a statute because [it] might deem its effects susceptible of improvement.'" *Barbieri v. RAJ Acquisition Corp.,* 199 F.3d 616, 621 (2d Cir.1999) (quoting *Badaracco v. Commissioner of Internal Revenue,* 464 U.S. 386, 398, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984)).

---

**11.** Before 1991, a "document deposition" was first required from a non-party in possession of documents, "which often was little more than a formalized document production session." 8A Wright, Miller & Marcus § 2209. Thereafter, as a result of the 1991 revision to Rule 45, it is no longer necessary to first depose the custodian of the material required to be produced, and the subpoena in the first instance "reaches all materials in the nonparty's control, wherever they are located." *Id.*

Finally, interrogatories and admissions apparently are unique to the United States. *See* Karen A. Feagle, *Extraterritorial Discovery: A Social Contract Perspective*, 7 Duke J.Comp. & Int'l L. 297, 299 (1996) ("the U.S. system of broad discovery is fundamentally different from that of most foreign countries ... [m]ost other countries fiercely limit the scope of discovery to protect personal privacy and consider U.S. discovery to be a fishing expedition" (quotation omitted)). Although in the Second Circuit reciprocal discovery is not viewed as a precondition to the reach of § 1782, it seems improvident to read into the statute discovery devices which are truly foreign to foreign courts.

## V. The Residual Discovery Issues

The Court has issued an order this date designating a Magistrate Judge to resolve the residual discovery disputes in accordance with this decision. The order also provides that the Magistrate Judge should conduct a hearing if deemed appropriate. Because many of the documents requested are contingent on answers to the disavowed interrogatories, the Court will, in the interests of fairness, allow Ishihara to refashion its document requests in accordance with the provisions of Rule 34. The Court notes in that respect that even if interrogatories were permissible, "Rule 33 may not be used to bypass Rule 34. Copies of documents and tangible things must be obtained by Rule 34 rather than requesting them in connection with interrogatories." 8A Wright, Miller & Marcus § 2163. In a similar vein, interrogatories that are in effect requests for admissions also are improper, because "a party seeking admissions must proceed under Rule 36." *Id.*

In resolving the discovery disputes, the Magistrate Judge will be guided by the procedures and practices governing discovery in the Federal Rules of Civil Procedure, as explicitly provided in § 1782, unless the Magistrate Judge decides to "otherwise prescribe." 28 U.S.C. § 1782. In that latter respect, if the Magistrate Judge's discovery orders are to be influenced by the practices and procedures of the foreign tribunal, as permitted by the statute, it will be incumbent on Shipley, as the party seeking to limit discovery, to satisfy the Magistrate Judge that comparable discovery is not sanctioned in an invalidity proceeding in the JPO. *See Bayer*, 173 F.3d at 190 ("[t]he party opposing discovery has the burden of demonstrating offense to the foreign jurisdiction, or any other facts warranting the denial of a particular application" (internal quotation omitted)). The Magistrate Judge should then consider this information as a "useful tool," *Aldunate*, 3 F.3d at 60, in the exercise of discretion under § 1782, and tailor an order in conformance with the twin aims of the statute. However, on questions of substantive Japanese law upon which any discovery order must relate, the parties are to comply with their collective responsibility to assist the Court in ascertaining such law. Thus, the Magistrate Judge should be furnished with an English translation of the Japanese law allegedly providing for the invalidation of a patent if a patented product is offered for sale in Japan prior to the filing of the patent application, as well as any other pertinent authority on the issue.

## CONCLUSION

The Court vacates that part of its order of April 18, 2000, and quashes the related parts of the subpoena, providing for interrogatories, documents in response to interrogatories, and requests for admissions.

**SO ORDERED.**